WILLIAM J. MATHESON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 26507. Promulgated January 7, 1930.

W. N. *Baylis, Esq.*, and *P. A. Galleher, Esq.*, for the petitioner.
*Maxwell E. McDowell, Esq.*, and *Frank B. Schlosser, Esq.*, for the respondent.

**OPINION.**

SMITH: The issues before us are (1) did the damage to petitioner's residence arise from "fires, storms, shipwreck, or other casualty" within the meaning of section 214 (a) (6) of the Revenue Act of 1921; and (2) did the amount of $23,861.10 given by the petitioner to the town of Huntington, N. Y., constitute a contribution to a political subdivision of a State for exclusively public purposes? The only evidence before us consists of affidavits of petitioner and various other persons, together with a photograph of the residence and a copy of a report published by the United States Department of Agriculture containing meteorological data pertinent to the city of Miami, all of which were submitted as joint exhibits.

With respect to the first issue counsel for petitioner maintain that the damage was attributable to storms and floods and more particularly to a severe storm occurring in February, 1922. In the alternative, it is urged upon us that the damage to the property arose from an "other casualty" analogous to shipwreck, this contention being

based largely upon the decision in *Shearer* v. *Anderson*, 16 Fed. (2d) 995.

The evidence in support of petitioner's contention that the damage resulted from storms and floods is very meager and we are of the opinion that the weight of such evidence has been greatly outbalanced by that which tends to show that the damage was due to faulty construction methods. There has been presented no direct testimony by anyone who personally saw any storms or floods which might have caused the damage in question. On the contrary, petitioner relies upon certain meteorological data prepared by Richard W. Gray, meteorologist, which shows that in February, 1922, a severe rain storm visited Miami. However, the record discloses a joint exhibit consisting of an affidavit of Richard W. Gray, who, having been duly sworn, deposed and said:

That he resides at Miami, Fla. and is a meteorologist in charge of the U. S. Weather Bureau Station at Miami, Fla. and is familiar with the meteorological records and data for the years 1919 to 1923, inclusive, maintained at this office.

That the records of the Miami Station give weather data for Miami, Fla. and immediate vicinity but that such records as to wind velocity and rainfall might vary considerably from those prevailing at the Southern end of Key Biscayne which is about 12½ miles distance from the Weather Bureau Station.

That rainfall has practically no effect upon the water level of the ocean, but that winds off the ocean at sufficient intensity for prolonged periods would cause the water to back up resulting in some increase in tidal level.

That at no time during 1922 did the records at the Miami Station show a wind from the East or Northeast (from the ocean) of a velocity exceeding 27 miles per hour; that there was a severe local rainstorm on Feb. 21, 1922 (not Feb. 11, 1922) of short duration, and that while for several days prior to this date there had been an Easterly wind, ranging in velocity from 2 to 25 miles per hour, that during said storm the wind was from the Northwest (off shore) at a maximum velocity of 30 miles per hour.

In opposition to the claim of the petitioner that the damage was caused by storms and flood, there was introduced as a joint exhibit the affidavit of J. R. Swanson, a contractor and builder residing in a suburb of Miami, who, after being duly sworn, deposed and said in part:

That he had the contract to build and did build during the latter part of 1917, the year 1918, and the early part of 1919, the residence known as "Mashta" for William J. Matheson situated on Key Biscayne, Florida, and that to the best of his recollection the contract for construction of the residence proper was about $41,000.00.

That said residence was built on a piling foundation over salt water of reenforced concrete and terra cotta. That there was a span between supporting walls or sills of about 28 feet, the floor and roof of which span were supported by 4" x 16" beams of poured concrete reenforced by bars of ⅞" steel.

That due to the fact that steel of sufficient length was not available it was necessary to lap four ⅞" bars in the center of each 4" beam.

That he is familiar with local climatic .conditions and he believes the repairs necessitated to the residence in question during 1921, 1922 and 1923 were not caused by a single storm or several storms but were caused by the gradual absorption of salt water by the porous concrete and the slow corrosion of the reenforced steel.

In the brief of counsel for the petitioner appears the folowing statement:

* * * The Bureau of Standards, as a result of tests, has determined that reenforcing steel must be protected by a thickness of at least two inches of concrete in order to prevent corrosion when subjected to immersion in salt water, its conclusion being stated as follows:

" Cement concrete is not subject to decomposition by the chemical action of sea water. Metal reenforcement is not subject to corrosion if embedded to a depth of two inches or more from the surface of well made concrete (Technologic Paper, Bureau of Standards, No. 12)."

We conclude, therefore, from the record before us that, as set forth in the findings of fact, the damage was caused by the rusting and corroding of the reenforcing steel and that such rusting and corroding was caused by faulty construction and not by storms and floods.

. This leaves for our consideration the alternative contention of counsel for the petitioner that the damage done to the property resulted from an " other casualty " analogous to shipwreck. In *Shearer* v. *Anderson, supra,* the court had for its consideration the deductibility of the cost of certain repairs to a damaged automobile and in the course of its opinion it said:

* * * As " casualty " expresses rather the result than the cause of the damage, that is, the wreck itself rather than the lightning, storm, or the negligence or fault of some person, so the " other casualty " is at least as clearly ejusdem generis with shipwreck as with fire or storm.

Shipwreck does not mean complete loss; damage to the ship suffices. Nor need such damage be caused by storms or other natural causes; the word is without limitation; a wreck through collision, whether due to the wrong or negligence of the other vessel or of the employee of the wrecked ship, is a shipwreck within the act. Furthermore the ship may be a pleasure yacht, in no way connected with a trade or business.

An automobile used for recreation and convenience would seem to be most closely analogous to a pleasure yacht. As Congress has made damages due to a wreck of the latter a deductible loss, the act should be construed to show an intent to cover a wreck to the former, similarly caused, inasmuch as such a construction can fairly and reasonably be given thereto.

Whether the complaint be interpreted as charging the loss to be due proximately to the overturning caused by the faulty driving of the chauffeur over an icy road, or to the subsequent freezing of the motor, in any event, it is alleged to be due to a casualty, analogous to a shipwreck, not caused by the willful act or neglect of the owner, or of one acting in his behalf. We conclude that such a loss is deductible.

While it may well be that an automobile is in some ways analogous to a yacht, which may be subject to shipwreck, still it is obvious that the house in question can not be so considered. Consequently, it becomes material to define both the words casualty and shipwreck. The word shipwreck is defined in Webter's New International Dictionary both as a noun and as a transitive verb. As a noun it means:

The destruction or loss, total or partial, of a vessel, as by sinking or by being cast ashore or driven against rocks or shoals.

As a verb it means:

To destroy, as a ship at sea, by driving ashore or upon rocks or sand banks, or causing to founder by the force of wind and waves.

The word casualty is defined in Webster's New International Dictionary as follows:

1. Chance; accident; contingency; also, that which comes without design or without being foreseen; an accident.
2. An unfortunate occurrence; a mischance; a mishap; a serious or fatal accident; a disaster. See ACCIDENT.

The word accident is defined in Webster's New International Dictionary as meaning:

Lit., a befalling; an event that takes place without one's foresight or expectation; an undesigned sudden, and unexpected event; chance; contingency; often, an undesigned and unforeseen occurrence of an afflictive or unfortunate character; casualty; mishap; as, to die by an *accident*.

The word casualty is defined in Bouvier's Law Dictionary, Rawle's Third Revision, as meaning:

Inevitable accident. Unforeseen circumstances not to be guarded against by human agency, and in which man takes no part. Citing Story, Bailm. Sec. 240; 1 Pars. Contr. 543; 2 Whart. Negl. 8th ed. 159, 160.

*Klopfenstein* v. *Union Traction Co.*, 112 Kans. 770; 212 Pac. 1097, is cited in Words & Phrases (third series) as judicial authority for the following discussion and definition of the word accident:

The word "accident" does not have a settled legal signification. It does have, however, a generally accepted meaning, which is the same whether considered according to the popular understanding or the approved usage of language. An "accident" is simply an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force. The word undesigned must not be taken too literally in this connection, because a person may suffer injury accidental to him, under circumstances which include the design of another. The word "accident" is popularly and properly used in its true etymological sense of that which falls to or happens, without more than implication of just the event.

The Supreme Court of Idaho, in *Eaton* v. *Glindeman*, 195 Pac. 90, in construing a section of law containing a proviso that the council of a city may order by a two-thirds vote " the repair or restoration

of any improvement, the necessity of which is caused by any casualty or accident," held that progressive decay of the underside of the planks of a municipal wharf was not "casualty" within the meaning of the proviso. In the course of its opinion the court said:

"Casualty" is a word of quite frequent use; yet it cannot be said that its definition has been very accurately settled by the courts. It has been said that strictly and literally the word "casualty" is limited to injuries which arise solely from accident, without any element of conscious human design or intentional human agency; something not to be foreseen or guarded against; something that happens not in the usual course of events; the word "casualty" being synonymous with "accident."

In view of the foregoing it appears to us that the word casualty as used in section 214(a) (6) of the Revenue Act of 1921 connotes the effect of some sudden and destructive force resulting in loss. While it is not disputed that in this case the petitioner suffered a loss, it is the contention of the respondent that such loss was occasioned by a rapid and extraordinary depreciation rather than by the application of any sudden force to the premises. With this view of the respondent we are inclined to agree and in our opinion the damage to petitioner's residence did not arise from "fires, storms, shipwreck, or other casualty" within the meaning of section 214 (a) (6) of the Revenue Act of 1921. Consequently, the amounts expended by him in the years 1922 and 1923 in repairing the residence are not deductible from gross income for those years. Incidentally, it may be pointed out that from the record before us it appears that repairs were begun in the year 1921 and that in the year 1922 the extent of the damage was well defined, so that in any event the propriety of allowing deductions in the years 1922 and 1923 might well be questioned, since the record is far from satisfactory with respect to the year in which the petitioner's loss was sustained.

With respect to the second issue it is undisputed that the amount in question was given by the petitioner to the town of Huntington, N. Y., the position of the respondent being merely one of doubt in view of Joint Exhibit R–18, reading *in toto* as follows:

Supplementary agreement for Lloyd's Neck Road, June 7, 1923—

Made by the members of the Town Board, June 7, 1923 "Special Improvements—On the road commencing at end present concrete and leading to Lloyd's Neck" known as Lloyd's Neck Road, a distance of 1⅗ miles there shall be expended the sum of $56,709.85 dollars for the following kind of improvement Concrete 16 feet wide 6 inches thick. Contribution of two taxpayers Marshall Field and William J. Mathewson.

Neither does it appear that any contention is being made that the town of Huntington was not a political subdivision of the State of New York. Consequently, the only question for us to decide is whether the money given to the town was contributed for exclusively

682

public purposes. The only evidence before us relative to this issue other than Joint Exhibit R–18 consists of affidavits of William B. Trainer, Town Clerk of Huntington, N. Y., and Abraham L. Field, Supervisor of Huntington. Each of these affidavits recites that the town of Huntington is a municipality and a political subdivision of the State of New York and has been such for some 200 years; that the executive body of the town of Huntington is its town board, which consists of the town clerk, the supervisor, and four justices of the peace, and that the monies of the town of Huntington are received and paid out solely by its supervisor, who has direct charge of its financial affairs under the direction of the town board. Each affidavit further recites:

*Fourth:* That is the month of June 1923, William J. Matheson, then residing upon Lloyds Neck (now Village of Lloyd Harbor) in the Town of Huntington, County of Suffolk and State of New York made a contribution and gift to said Town of Huntington in the sum of $23,861.10, which sum was paid into the Treasury of said Town for Town and Municipal purposes.

*Fifth:* That said money so paid was used by said Town with other Town moneys in constructing a permanent, concrete roadbed on a public highway leading from West Neck to Lloyds Neck in said Town a distance of some two or three miles, and that said road upon which said money was so expended is a public highway and has been continuously such for more than one hundred years last past. That said highway passes through and along the properties of Roland R. Conklin, Estates of Mary E. and Oliver L. Jones, Anna M. Wood, Marshall Field, Charles J. Symington, and various other persons; and that such highway, so improved during that year, was then and still is one of the most important public highways in said Town, is in close proximity to Cold Spring Bay and Lloyds Harbor for a distance of some two miles, and is much used by the general public for business and pleasure, dozens of automobiles and hundreds of people passing over it daily.

In view of the foregoing we are of the opinion that the amount of $23,861.10 was contributed by the petitioner during the year 1923 to a political subdivision of the State of New York for exclusively public purposes and that such amount constitutes a proper deduction from gross income for that year under the provisions of section 214(a)(11) of the Revenue Act of 1921.

*Judgment will be entered under Rule 50.*