LOUIS BROIDO AND LUCY KAUFMAN BROIDO, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66361. Filed July 31, 1961.

*Louis Broido* and *Sanford Becker*, *CPA*, for the petitioners.
*Victor H. Frank*, *Jr.*, *Esq.*, for the respondent.

OPINION.

TURNER, *Judge:* In section 23(e)(3) of the Internal Revenue Code of 1939,[3] provision is made for the deduction of losses of property not connected with the taxpayer's trade or business, where the loss arises from fire, storm, shipwreck, "or other casualty."

The record shows that in 1949 there was a severe drought in the State of Connecticut, including the area in which petitioner's property was located. It is the contention of petitioner that the drought so experienced was a casualty within the meaning of section 23(e)(3), and that he sustained a loss of property arising therefrom.

In *Maurer* v. *United States*, 178 F. Supp. 223, decided by the United States District Court for Kansas and reversed on another issue at 284 F. 2d 122, and *Buttram* v. *Jones*, 87 F. Supp. 322, decided by the United States District Court for the Western District of Oklahoma, it has been held that a drought was a casualty within the meaning of the statute, and that losses of property arising therefrom are deductible under section 23(e)(3).

This Court, on the other hand, has not as yet found it necessary to determine that a drought is, or is not, a casualty within the meaning of the statute, although the question was posed in *James M. Kemper*, 30 T.C. 546, affd. 269 F. 2d 184, which involved a loss of shade and ornamental trees on the taxpayer's residential property. In addition to evidence to the effect that the killing of trees by drought might require a recurrence of drought over a number of years, which would be a gradual and not a sudden occurrence, there was other evidence tending to show that the death of the trees could have been from forces other than the drought. Such being the state of the proof, it was concluded and held that the taxpayer had not shown that the loss of the trees resulted from the drought, and it was accordingly unnecessary to determine that the drought was or was not a casualty within the meaning of the statute.

---

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

* * * * * * *

(e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

* * * * * * *

(3) of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft. * * *

Similarly, in this case, even if it be held that the drought experienced was a casualty within the meaning of section 23(e)(3), the loss for which deduction is claimed must, if it is to be allowed, have been a loss "of property" actually sustained during the taxable year and a loss occasioned by the casualty to which it is attributed. There is no allowance for deductions on account of fluctuations in value. And since the natural impact of fires, storms, or shipwreck on property is physical damage or destruction, it is equally obvious, we think, that Congress was thinking in terms of such damage or destruction in listing as deductible, losses "of property" from "fires, storms, or shipwreck." The words "or other casualty" first appeared in the Revenue Act of 1916, when they were inserted to follow the words "fires, storms, shipwreck." Since that time, much has been written in the decided cases as to their meaning and scope, and from the beginning, they have consistently been interpreted as meaning an event or happening which was destructive of the property in question and was sudden in its occurrence. And while there have been differences of opinion as to what should be regarded as a sudden occurrence, we have found no departure from the concept that the loss covered was that represented by physical damage of property, whether the result was partial or complete destruction. See *Shearer* v. *Anderson*, 16 F. 2d 995; *Daniel T. Ebbert*, 9 B.T.A. 1402; *William J. Matheson*, 18 B.T.A. 674, affd. 54 F. 2d 537; *Harry Johnson Grant*, 30 B.T.A. 1028; *United States* v. *Rogers*, 120 F. 2d 244; *Charles J. Fay*, 42 B.T.A. 206, affd. 120 F. 2d 253; *Rosenberg* v. *Commissioner*, 198 F. 2d 46, reversing 16 T.C. 1360 as to the suddenness factor; *Buist* v. *United States*, 164 F. Supp. 218; *E. G. Kilroe*, 32 T.C. 1304; *Buttram* v. *Jones*, *supra;* and *Maurer* v. *United States*, *supra.*

The claim here is for the deduction of $7,371.56, which is the amount expended for the new deep-drilled well, pump, pumphouse, water storage tank, and purifying system. The facts show that in the winter of 1949–1950, following the drought of 1949, petitioner drilled the well and installed the mentioned appurtenances, destroying one of the dug wells in the process and abandoning the other two. The contention is that the fair market value of the property overall immediately following the drought was less by $7,371.56, the amount of the cost of the new well, than it was immediately before the drought.

In making this claim, petitioner, on brief, has disavowed any contention that the dug wells were destroyed by the drought. And if he did so contend, he would be faced with an absence of proof to sustain such a contention. According to petitioner's own experience, the three wells had been fully effective from 1941, when he purchased the property, and, on brief, he suggests that this could have been true

as far back as 1827, "when the house was built." At the best, the proof is that there was a water shortage from the three wells during the period of the drought. There is no proof of expectancy that the water levels would continue to be such that the three wells would not thereafter supply adequate water for petitioner's needs, as they had in all prior years. Furthermore, the proof does show that water levels in Connecticut did rise and that at the end of 1949 the water table in most sections of the State was only slightly below normal.

As for the three wells, the proof only shows that they were abandoned by petitioner as sources of water for his property, in favor of a deep-drilled well, the well at the corner of the house being destroyed in the drilling of the new well. At one point, petitioner did testify that the well which served the barn "went bad," but did not explain what he meant by that, and there is no evidence that its going "bad" was in any way attributable to the drought. Petitioner later testified that the two wells remaining after the new well was drilled were covered over, that he had lifted the lids to check for rodents, but did not know how the water levels compared with what they had been prior to the 1949 drought.

Actually, petitioner's contention, as set forth in his reply brief, appears to be that the 1949 drought, which was unprecedented for the area, "revealed that his wells were inadequate to supply the property with water during such drought." This would appear to be no more than to say that the situation was in fact the same both before and after the drought, namely, that a new and further source of water was necessary to provide adequate water in the event of a drought of equal intensity to the 1949 drought, and that a deep-drilled well would not only be new but something the property never had had before. In no true sense of the words may it properly be said that the new well was in the nature of repair or restoration of property damaged or destroyed by the drought, or that its cost was a measure of loss, if any, sustained therefrom, rather than an improvement or betterment to his residential property.

The record does show that there was some damage to petitioner's plantings and grounds from the 1949 drought, in that, due to lack of water brought on by the drought, the flowers, plants, shrubs, and lawns "were all dried out and ceased growing," and required "expensive" treatment in the spring of 1950 "to bring them back," including reseeding and resodding of the lawns.

Where property is damaged or destroyed by fire, storm, shipwreck, or other casualty, it appears settled law that a proper measure of the loss sustained, and thus the amount of the allowable deduction, is the difference between the fair market value of the property immediately before the damage occurred and its fair market value immediately

after, not to exceed basis and to the extent not compensated for by insurance or otherwise. *Helvering* v. *Owen*, 305 U.S. 468.

In the instant case, petitioner has shown neither the fair market value of his property as it was when the drought started nor as it was when the damage had been done. Furthermore, there is no way of knowing whether the damage which was incurred was such or of sufficient magnitude to affect the fair market value of the property overall. It would be extremely doubtful, we think, that even if the vegetables in the gardens and the flowers which were annuals were killed by the drought, such loss for the 1949 season, or such part of the year as they were killed, would seriously affect the fair market value of the property overall. As for the perennials, shrubs, and lawns, the testimony is that they "were all dried out and ceased growing," and required "expensive" treatment in the spring of 1950 "to bring them back." It would thus appear that except possibly for the lawns, which were described at one point as burned out, the plants and shrubs survived, even though they did cease to grow in 1949. And when related to the value of the total property, the amount of expense required to bring them back in the spring of 1950 may or may not have been of significance, for the purposes here. Furthermore, it is not unusual, even in the normal course, for lawns to require reseeding and resodding from time to time in whole or in part, and again, there is no way of telling the extent, if any, by which the fair market value of the property immediately before and immediately after the drought was affected. Possibly the reason for such state of the record is that petitioner has not based his claim of loss under section 23(e)(3) on the damage done to the flowers, plants, shrubs, and lawns on his property.

We are accordingly unable to say that petitioner has shown, under the rule in *Helvering* v. *Owen*, *supra*, even by taking into account some amount representing the so-called expensive treatment to the plantings on his property, that he in fact sustained a loss which would be deductible on a holding that an unprecedented drought such as was experienced in 1949 in the area in which his property was located, was a casualty within the meaning of the statute.

As for the nonbusiness bad debt issue, it is our conclusion that it must be resolved against petitioners. The note involved had been received in 1929 by petitioner from Henry, his younger brother, as part payment for a portion of petitioner's interest in the family business. In 1930, petitioner sold the note, at face, to Bella Broido, the widow of his elder brother. The family business had been a profitable business, and there is no indication of record that either petitioner or Bella had any thought that the note was not worth the amount she had

paid petitioner therefor. By 1932, however, the country was in the throes of the big depression and the family investment in the mortgage and lumber businesses was lost. Henry had never theretofore made any payments on the note, either principal or interest, and he never made any payments thereafter. The note was a demand note, but petitioner makes no claim that ever at any time did he ask or demand payment. Apparently the same was true of Bella, even though she owned the note, it being petitioner's testimony that she looked to him, not Henry, for payment. Furthermore, the record suggests, if it does not fully show, that over a substantial part if not most or all of the period after the note was made, Henry could have made payment of the note, if he so desired. And certain it is that there is no proof that he would not have paid the note if petitioner had requested payment of him. It could, of course, be that since Henry was petitioner's brother, petitioner had no inclination to require further payment for the interest in the family businesses for which the note had been received, which businesses, within some 3 years thereafter, had been a total loss.

As for Bella, petitioner had actually received in cash and for his own purposes and uses, the amount of money represented by the note. Further, in view of the family relationship, it is understandable that petitioner would, if he was able, desire to repay to Bella the money he had received from her, even though, considering all of the facts and circumstances, he would not, and did not, press Henry for payment.

We are not convinced or persuaded by the evidence of record that from and after the failure of the family businesses, petitioner regarded the note which had theretofore been received in the sale of a portion of his interest in the businesses as a continuing obligation on the part of Henry. On the other hand, taking into account the facts which are shown, including the family relationship between Bella and petitioner, it is, in our opinion, reasonable to conclude that the controlling consideration for the payments to Bella was a desire on the part of petitioner to repay the money he had received from her and used for his benefit, without regard to the fact that the money had originally been received from her as payment for Henry's note.

Such being the state of the record, we conclude and hold that petitioner has failed to prove the existence of a valid and subsisting debt which became worthless in 1949.

Reviewed by the Court.

*Decision will be entered under Rule 50.*