JACK R. AND AMELIA B. FARBER, PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7885–70. Filed March 6, 1972.

*J. Robert Jackson* and *Theodore V. Spangler, Jr.*, for the petitioners.

*W. Durrell Nielsen*, for the respondent.

DAWSON, *Judge:* Respondent determined a deficiency of $2,201.81 in petitioners' Federal income tax for the year 1968.

Respondent has conceded that the petitioners are entitled to a charitable contribution deduction of $665.80. At issue is whether the petitioners are entitled to a casualty loss deduction under the provisions of section 165(c)(3), I.R.C. 1954,[1] after the application of a weedkilling chemical product known as Cytrol, inadvertently recommended by a retail supplier, resulted in the destruction of part of the lawn, trees, and shrubs around their personal residence. If such loss qualifies as a "casualty," we must determine the amount of the loss.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Jack R. and Amelia B. Farber (herein called petitioners) are husband and wife whose legal residence was in Nampa, Idaho, when they filed their petition in this proceeding. Petitioners filed their joint Federal income tax return for the taxable year 1968 with the Internal Revenue Western Service Center at Ogden, Utah.

Jack R. Farber (herein called petitioner) is a pediatrician who has practiced medicine in Nampa, Idaho, for about 20 years. He and his wife are the owners of a 4-acre tract of land located near Nampa on which they built their home in 1960 at a cost of approximately $65,000 exclusive of the land. The house was on one-half an acre. It was surrounded by 2½ acres of lawn and landscaped area consisting of many trees and shrubs. The remaining acre was pastureland. The lawn was seeded in 1960 and 1961, and the trees and shrubs were planted on the property between 1960 and 1965.

By September 1971 the petitioners had a total investment of about $100,000 in the property.

On March 23, 1968, the petitioner purchased from the Storey Feed & Seed Co. of Nampa a gallon of a weedkilling chemical product known and sold under the trade name of Cytrol. When the petitioner entered the store he asked a salesman what he should use for killing "quack grass" on his lawn. The salesman recommended that the petitioner use Cytrol, a strong chemical agent. He suggested that a gallon of Cytrol per acre should be used. A gallon container of Cytrol normally has a gummed label attached to it which contains a caution that the product should not be used on vegetation not desired to be killed. Petitioner does not recall seeing or reading such a label on the gallon of Cytrol he bought from the Storey Feed & Seed Co.

The petitioner applied the Cytrol, using a sprayer attached to a small garden tractor, to 1 acre of the lawn, mostly in front of his house. The next day he went to the store to obtain some more Cytrol. He walked back to the counter where he had gotten the first gallon and picked up another. He noticed that it had a small pamphlet at-

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

tached to it by a heavy rubberband. It stated, "Do not remove." Not having seen this on the first gallon he bought, he read it and it stated in bold type "Do not use on lawns." Petitioner immediately contacted a salesman (not the one who had sold him the first gallon) who told him "this stuff will kill all grass." They then talked to the first salesman who was under the impression the petitioner had only wanted to spray around the edges of his lawn and driveways.

One week later the petitioner's lawn began "turning yellowish," and about 2 weeks thereafter the lawn had turned completely brown and died. In addition, within a short period of time, trees, shrubs, and flowers adjacent to the lawn area on which the Cytrol was applied also showed signs of dying. All together, 1 acre of lawn, 13 trees, and several evergreens died.

Being quite upset about the condition of his lawn and landscape, the petitioner consulted Hans Borbonus, president of Hansgeorg Borbonus Landscaping, Inc., who is a horticulturist and landscape architect. Mr. Borbonus recommended that the old sod be removed and new sod laid. The estimated cost of replacement was $11,000. Allowing for an adjustment of $2,500 for an area not visible to street traffic and which could be patched and reseeded, the cost of replacement of the lawn was $8,500. The estimated replacement cost of the trees and shrubs was $780.

Storey Feed & Seed Co. carried product liability insurance with the Fireman's Fund American Insurance Co. In late April 1968 the petitioners filed a claim for $11,000 against the Storey Feed & Seed Co. and Fireman's Fund. After settlement negotiations, the petitioners accepted $1,500 on August 20, 1968, and released all claims they had against Storey Feed & Seed Co. Petitioner was not pleased with the settlement but accepted it rather than file an action in court. Petitioner's family and the Storey family had been friends for two or three generations. The petitioner, being a prominent physician in the community, did not want to take a chance on any adverse publicity which might result from a lawsuit.

Petitioners did not resod the lawn. They have reseeded and fertilized it heavily since 1968 and it is gradually being restored. Petitioners have submitted no evidence as to the actual cost expended by them for repairing the lawn or replacing the trees and shrubs.

Petitioners claimed a casualty loss deduction of $6,900 on their Federal income tax return for the year 1968 which was computed by estimating the cost of replacement at $8,500 and deducting therefrom the $1,500 insurance recovery and the $100 limitation. Respondent disallowed the claimed deduction in his notice of deficiency with the following explanation:

You claimed a casualty loss on page 2 of your return in the amount of $8,500.00 reduced by insurance proceeds in the amount of $1,500 and the limitation of $100.00, or a net deduction of $6,900. This loss resulted from your use of a chemical on your lawn, trees, and shrubs, which killed part of the lawn, trees, and shrubs. You have not shown how you arrived at your total loss figure of $8,500. You settled with the insurance company for $1,500 for all claims against the sellor [sic] of the chemical. It is held that your loss did not exceed the amount of the insurance reimbursement. Accordingly, the deduction of $6,900 is disallowed.

The fair market value of petitioners' residential property (house and land) immediately before the Cytrol was applied was $82,500. Its fair market value after the Cytrol was applied was about $74,500. The decrease in the total value of the property was $8,000.

### OPINION

Petitioners seek to sustain their claimed deduction of $6,900 as a "casualty" loss under section 165(c)(3)[2] of the Code. But the respondent maintains that the petitioners did not suffer a "casualty" within the meaning of that term as used in the statute.

Respondent's first contention is that the damage to the lawn, trees, and shrubs was not unexpected, but that the petitioner either willfully applied the Cytrol knowing it would kill the lawn or was grossly negligent as to its use. He claims that the gummed label on the Cytrol container gives instructions for its use and a caution that the product should not be applied to any vegetation not to be killed. He then argues that—

The reading of the gummed label to obtain the directions for use would have alerted the petitioner to the caution. The petitioner either ignored the caution, or he intended to kill the lawn because of the density of the quack grass and other weeds. If he ignored the caution, then his own gross negligence was the primary cause of the damage. If he intended to kill the lawn because of the density of the quack grass and other weeds, then the damage was clearly anticipated and not unexpected.

Section 165(c)(3) limits an individual's loss deduction for nonbusiness property to losses arising from "fire, storm, shipwreck, or

---

[2] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\*     \*     \*     \*     \*     \*     \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

\*     \*     \*     \*     \*     \*     \*

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return.

other casualty, or from theft." Neither the Code section nor the applicable Treasury regulations defines the term "other casualty." The courts, however, have interpreted "other casualty" to mean an event or happening which was destructive of the property and was sudden in its occurrence. *Louis Broido*, 36 T.C. 786 (1961). An "other casualty" must also be unexpected, violent, and not due to the deliberate or willful actions of the taxpayer.[3] *John P. White*, 48 T.C. 430, 435 (1967). Moreover, this Court has held that a taxpayer's *ordinary* negligence will not be a bar to a casualty loss, although *gross* negligence would be. *Harry Heyn*, 46 T.C. 302, 308 (1966) ; *John P. White, supra* at 435.

We reject respondent's assertions that the petitioner's actions were deliberate or willful or grossly negligent. The evidence herein will not support such a finding. While the petitioner may not have exercised due care by not reading the gummed label on the Cytrol container, he did rely on the saleman's recommendation and instructions as to its use. Such reliance was not unreasonable or imprudent. The facts do not show the existence of the knowingly malicious and wanton conduct required to establish gross negligence. Under these circumstances we are unwilling to conclude that the petitioner deliberately attempted to destroy a lawn, trees, and shrubs in which he and his family had invested considerable personal labor, time, and money. We think the resulting loss was a "casualty" which was unexpected and of an unusual nature, and we so hold.

Alternatively, respondent contends that, if there was a casualty loss, the amount of the loss actually sustained should be limited to the amount of insurance recovery ($1,500) received by the petitioners. We disagree.

Where there is a casualty, it is settled law that the proper measure of the loss sustained in the case of nonbusiness property is the difference between the value of the property immediately before the casualty and its value immediately thereafter, not to exceed cost or other adjusted basis, and diminished by the amount compensated by insurance or otherwise. *Helvering* v. *Owens*, 305 U.S. 468, 471 (1939). There is nothing in the statute or regulations that limits the deduction of the amount of the loss actually sustained to the amount of the insurance recovery. There is simply no legal basis for it.[4] The only relevance of insurance recovery is that it must be subtracted from the total loss to determine the deductible amount.

---

[3] We think a good conventional definition of a "casualty" is the complete or partial destruction of property resulting from an identifiable event of a sudden, unexpected, or unusual nature.

[4] See *Richard R. Hollington*, 15 T.C. Memo. 668, 671 (1956), where this Court stated that an insurance settlement may be given consideration, but is not conclusive or controlling as to the amount of the actual loss.

In determining the amount of loss deductible under section 165, two methods of valuation are acceptable: (1) The decrease in fair market value as a result of the casualty and (2) the cost of repairs.[5] To avail himself of the "cost of repairs" method of valuation, a taxpayer must meet all four requirements of the regulations. Two of these requirements are that (1) the *amount spent* for such repairs is not excessive and (2) that the value of the property *after the repairs* does not exceed the value of the property immediately before the casualty. The first contemplates actual repairs and expenditures, not just estimates. In cases where this Court has permitted the "cost of repairs" method to be used to ascertain the amount of the loss, the repairs and expenditures were actually made. Cf. *W. F. Harmon*, 13 T.C. 373, 382–383 (1949); *Austin Clapp*, 36 T.C. 905, 908 (1961), affd. 321 F. 2d 12 (C.A. 9, 1963). The use of estimates has not been regarded as persuasive. Here the petitioners have submitted no evidence as to the actual costs incurred by them in repairing the damaged lawn and replacing the trees and shrubs. Their claim based on this method of valuation is only supported by the estimate of Hans Borbonus, the horticulturist and landscape architect, for replacing the lawn with new sod. The lawn has never been resodded. The petitioners have continually replanted it heavily with new seed and fertilized it. A second reason for rejecting the "cost of repairs" method here is that it would have increased the value of the lawn over what it was immediately before the application of the Cytrol. The new sod was of better quality.

Section 1.165–7(b)(1), Income Tax Regs., provides that the amount of the loss shall be the lesser of (1) the difference between the fair market value of the property immediately before and immediately after the casualty, or (2) the adjusted basis of the property involved.[6]

We find the petitioners' evidence as to the decrease in the fair market value of the total property after the casualty sufficient to determine the amount of the loss sustained. N. E. Coley Smith, a qualified real estate appraiser, estimated that the fair market value of the property

[5] Sec. 1.165–7(a)(2), Income Tax Regs., provides:
(2) *Method of valuation.* (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property.
(ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.
[6] The parties herein have stipulated that the adjusted basis of petitioners' residence, including the real property and improvements, exceeds the claimed casualty loss deduction.

immediately before the casualty was $82,500 and that after the damage to the lawn, trees, and shrubs the fair market value had decreased by approximately $8,000. We are satisfied on this record that the fair market value of petitioners' property decreased by the amount of $8,000 as a result of the damage caused by the application of Cytrol. Our findings of fact so reflect. See and compare *Donald G. Graham*, 35 T.C. 273 (1960). Accordingly, we hold that the petitioners are entitled to a casualty loss deduction of $6,400 ($8,000 less the insurance recovery of $1,500 less the $100 limitation).

*Decision will be entered under Rule 50.*