# United States Tax Court

T.C. Memo. 2023-43

THOMAS K. RICHEY AND MAUREEN P. CLEARY,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 14568-20.                                Filed March 28, 2023.

————

*Shadi M. Halavi*, for petitioners.

*Sarah A. Herson* and *Nathan C. Johnston*, for respondent.


## MEMORANDUM OPINION AND FINDINGS OF FACT

HOLMES, *Judge*: Thomas Richey and Maureen Cleary claim that their vacation home and boat were damaged by a storm in 2017. They reported a very large casualty-loss deduction of nearly $740,000 which, when lashed to Richey's very large wage income, enabled them to report zero taxable income for the year. The Commissioner says that the couple haven't substantiated the cost of the damage that they suffered and haven't even proved that any of the damage was caused by the storm.

Whom are we to believe?

## OPINION

What a casualty loss is, and how to measure it, are unusually well-settled. We begin there, and then apply the law to the particular facts of this case.

Under section 165, a taxpayer can deduct nonbusiness losses that "arise from fire, storm, shipwreck, or other casualty, or from theft."

[*2] § 165(a), (c)(3).[1] He can claim these losses only for certain kinds of damage, only for damage caused in certain ways, and only for an amount of damage calculated according to certain rules.

I.      *The Damage Required*

The first rule of casualty losses is that only physical damage counts. *Furer v. Commissioner*, 33 F.3d 58, 1994 WL 417425, at * 1 (9th Cir. 1994) (unpublished table decision), *aff'g* 65 T.C.M. (CCH) 2420 (1993); *see also Citizens Bank of Weston v. Commissioner*, 28 T.C. 717, 720 (1957) (same), *aff'd*, 252 F.2d 425 (4th Cir. 1958); *Dubin v. Commissioner*, 35 T.C.M. (CCH) 1120, 1122 (1976).

This means, most importantly, that deductible casualty losses do not include decreases in property value, even decreases in value attributable to the market's perception of the probability of future casualties. *Citizens Bank*, 28 T.C. at 720; *see also Kamanski v. Commissioner*, 477 F.2d 452, 452–53 (9th Cir. 1973) (loss in value from predictions of future casualties not casualty loss), *aff'g* 29 T.C.M. (CCH) 1702 (1970); *Pulvers v. Commissioner*, 407 F.2d 838, 839 (9th Cir. 1969) (loss in value to properties adjacent to landslide not casualty loss), *aff'g* 48 T.C. 245 (1967).

In *Kendall v. Commissioner*, 17 T.C.M. (CCH) 809, 811 (1958), we summarized the caselaw: A loss does not qualify as a casualty loss when the loss is "the result of fear on the part of prospective buyers of damages that might be sustained in future years as a result of storms, contemplated as possible and even probable, but which had not yet occurred and which might never occur." The reason behind disallowing such losses is that the fears of prospective buyers are "not caused by storms which occurred only in [the year at issue], but [rather] by a history of storm damages extending over a period of several, and probably many, years." *Id.*

II.     *The Causation Required*

The second rule of casualty losses is that the loss must be proximately caused by "fire, storm, shipwreck, or other casualty." The IRS and courts look for a close link between event and damage.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] Deductible damage must result from a "sudden, externally-caused" force and not "progressive deterioration of property." *Khinda v. Commissioner*, 48 T.C.M. (CCH) 875, 876 (1984) (quoting *Fay v. Helvering*, 120 F.2d 253, 253 (2d Cir. 1941)); *see, e.g., Henke v. Commissioner*, 32 T.C.M. (CCH) 874, 875 (1973) (damage must be attributable to "a sudden unexpected happening"); *Kemper v. Commissioner*, 30 T.C. 546, 548 (1958), *aff'd*, 269 F.2d 184 (8th Cir. 1959)).

A loss may, of course, have more than one cause. Think of a decrepit building that's knocked down by a hurricane. When damage is caused in part by wear and tear, failure to maintain, or some other form of progressive deterioration, the taxpayer must prove that the casualty was an independent and sufficient cause of the loss. *See Edens v. Commissioner*, 33 T.C.M. (CCH) 1419, 1421 (1974) (failure to prove damage from casualty and not gradual deterioration), *aff'd without published opinion*, 549 F.2d 798 (4th Cir. 1976); *see also Hayward v. Commissioner*, 27 T.C.M. (CCH) 547, 550 (1968) (same).

III.    *Calculating the Deduction*

A taxpayer who can show that a storm or other casualty has proximately caused physical damage then needs to calculate the amount of that damage. That means he must find the difference between the fair market value of the property "immediately before the casualty," and the fair market value of the property "immediately after the casualty." Treas. Reg. § 1.165-7(a)(2)(i), (b)(1). But even that is not enough, for now we come to the third and final rule of casualty losses: A taxpayer can't deduct the whole amount of his loss but must run it through a sharks alley of statutory and regulatory limitations, each of which can take anything from a nibble to a gouge out of the actual amount of his loss and leave him with a deduction much smaller than he wants:

- Casualty losses are deductible only for the tax year in which the losses actually occurred, § 165(a); Treas. Reg. § 1.165-1(d)(1);

- they are deductible only to the extent that they exceed $100, § 165(h);

- they are deductible only to the extent they exceed 10% of a taxpayer's adjusted gross income, § 165(h)(2);

**[\*4]** • they are deductible only to the extent they do not exceed a taxpayer's adjusted basis in the damaged property, Treas. Reg. § 1.165-7(b)(1)(ii);

• and they are deductible only if the taxpayer is uninsured or, if insured, filed "a timely insurance claim with respect to such loss," § 165(h)(4)(E).[2]

Taxpayers also have to wade through some difficult problems of proof. The difference between the fair market value immediately before and immediately after the casualty event "shall generally be ascertained by competent appraisal." *See* Treas. Reg. § 1.165-7(a)(2)(i); *Lamphere v. Commissioner*, 70 T.C. 391, 395 (1978). A taxpayer may appraise his own property when he has sufficient knowledge and expertise of the relevant values before and after the casualty event. *Coates v. Commissioner*, 112 T.C.M. (CCH) 470, 474 (2016). But a competent appraisal must take into account the shift in the market due to the casualty event. Treas. Reg. § 1.165-7(a)(2)(i).

The law doesn't always require appraisals, though. Sometimes we can use proof of a property's trade-in value immediately before and after the casualty event. *Caras v. Commissioner*, 23 T.C.M. (CCH) 1103, 1105 (1964). Trade-in values, however, are not persuasive when they factor in dealer discounts and thus do not reflect actual market prices. And a listed price is not the same as a market price—just advertising property for sale at a specific price is not persuasive evidence of its fair market value. *Hale v. Commissioner*, 44 T.C.M. (CCH) 1116, 1119 (1982).

Taxpayers can also win without either an appraisal or proof of actual market prices—sometimes the cost of repairs is good enough when "(a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty." Treas. Reg. § 1.165-7(a)(2)(ii). Estimates of repair costs are not persuasive. *Farber v. Commissioner*,

---

[2] This section does not limit the deduction for a taxpayer who has no insurance. It limits the deduction in part for a taxpayer who has insurance and files a claim and who does not receive full compensation for his loss. But for a taxpayer who has insurance and doesn't file a claim it eliminates the deduction altogether.

[*5] 57 T.C. 714, 719 (1972). We consider instead only "actual repairs and expenditures" that a taxpayer incurred. *Id.*

FINDINGS OF FACT

With the law anchored in place, we can now tie it to the facts of this case.

I.    *Background*

Thomas Richey and his wife Maureen Cleary both had had successful careers and retired well before 2017. Though Cleary stayed retired, Richey's career as a Coast Guard officer eventually lured him out of retirement and into the private sector, where he rose to become head of global cybersecurity for Raytheon Technologies. His new berth greatly increased the couple's fortunes and enabled them to buy a second home in Stone Harbor on Cape May in the south of New Jersey. Their home is on the waterfront with docks, bulkheads, and access to the open ocean. Richey and Cleary bought the home in 2007 and became boat owners the next year when they acquired a 40-foot boat they named *Celtic Dreams*.

They still owned the home and the boat in March 2017, when Winter Storm Stella hit Stone Harbor and flooded the city's streets. Richey and Cleary claim the storm damaged the waterside portion of their property and their boat, then stored at a marina for the winter.

II.    *Richey and Cleary's 2017 Return, Audit, Petition, and Trial*

The couple filed their 2017 tax return in August 2018 with the help of a preparer from H&R Block. On it, they claimed total casualty losses of more than $820,000 and a deduction—after taking into account the income limitation we've already described—of nearly $740,000. They attributed about $640,000 of the loss to the vacation home and about $180,000 to the boat.

Looking first to the home, Richey and Cleary reported that before the storm its fair market value was $2,677,650 and that after the storm its fair market value was $1,994,175. They reported receiving a reimbursement, from a source they did not identify, of a bit less than $40,000. They claimed that their basis in the home was $2,450,000. They subtracted this reimbursement from the difference between the home's reported value before and after the storm to reach a casualty loss of

[*6] about $640,000. Since the loss was less than their home's basis the couple claimed the entire amount.[3]

They performed a similar calculation for their boat. They reported a fair market value immediately before the storm of $364,550, and storm damage of about $180,000. They reported no reimbursement, so their total reported loss came to about $180,000. They reported a basis in the boat of $480,000. This basis was greater than their loss so they claimed the entire amount of the loss as a casualty deduction.

We can summarize:

|  | *House* | *Boat* |
| --- | --- | --- |
| FMV Before Casualty | $2,677,650 | $364,550 |
| FMV After Casualty | 1,994,175 | 184,780 |
| Insurance or Other Reimbursement | 39,763 | — |
| Loss | 643,712 | 179,770 |

Such a large loss—one that caused them to reduce their adjusted gross income of more than $850,000 to a taxable income of zero—bobbed into the Commissioner's view, and he selected their return for audit. At the end, he issued a notice of deficiency for 2017 in which he disallowed the casualty-loss deduction in its entirety.[4] Richey and Cleary timely

---

[3] The losses that were claimed on both the vacation home and the boat were reduced by $100 as is required by statute.

[4] The notice of deficiency included an accuracy-related penalty. Respondent conceded this penalty since he failed to provide evidence of the written authorization that is necessary to impose it. *See* § 6751(b); *Graev v. Commissioner*, 149 T.C. 485, 493–94 (2017).

[*7] petitioned our Court, and though they resided in Maryland, asked for trial in Los Angeles.[5]

We added the case to one of our trial calendars for Los Angeles, but on the first day of that session neither petitioner showed up. Their lawyer said that the couple did not have enough time to get tickets to travel to the trial, though we'd sent them a pretrial order in mid-December 2021 telling them of the trial date in April. We postponed trial for a day to enable Richey to testify via Zoom. He testified that he learned about the trial only a week before calendar call, and even then, no one told him any specific details about the proceeding. We do not find this credible, and this finding affects our overall evaluation of his testimony. Ms. Cleary did not testify at all.

III.  *Storm Damage*

We presume the notice of deficiency is correct. *Welch v. Helvering*, 290 U.S. 111, 115 (1933), and a petitioner bears the burden of proving that he is entitled to a deduction that the Commissioner disallowed, Rule 142(a). No one doubts that storm damage may be deductible—section 165 says so on its face. But that still leaves Richey and Cleary with the need to prove that the storm directly caused physical damage to their vacation home and boat.

The couple's case began taking on water right at the start, when Richey was asked about any proof he had that the storm itself had caused damage to his property. He testified that he had taken pictures of the damage to both home and boat on his phone shortly after the storm. He explained, however, that a later software update to his phone deleted them. That left him to introduce only photographs of the house taken in 2018, nearly a year after the storm hit and after reconstruction had already begun. These photographs depict no visible damage other than that which one might see at any construction site, and we could see nothing that showed damage that we could specifically attribute to the storm. They are insufficient to prove that the property was damaged let alone that the damage was attributable to Stella, and we do not find Richey's testimony, standing alone, credible on this point.

---

[5] Appellate venue thus presumptively lies in the Fourth Circuit. § 7482(b)(1)(A).

**[\*8]**    As for the boat, the couple introduced a photograph of what the boat looked like before the storm, but nothing to show what it looked like afterwards. The couple also gave us no receipts for any boat repairs.

We don't doubt that a severe winter storm could damage property on the coast, but the absence of evidence leads us to find that it is more likely than not the case that it did not damage the property at issue here. *See House v. Commissioner*, 69 T.C.M. (CCH) 2005, 2025 (1995).

IV.    *Test*

If the absence of proof of damage causes the couple's case to founder, the absence of proof on valuing that damage causes it to sink altogether. Even if we found that the storm damaged the home and boat, they would still have to show us

- the diminution of their property's value caused by the storm, and their basis in that property; and

- proof that they either lacked insurance or had made a claim for compensation and received none.

We'll dive first into the problems of valuing the damage to the home and then to the boat.

A.    *The Vacation Home*

Richey and Cleary reported damage of $683,475; a basis of $2,450,000; and reimbursement (though whether from insurance or some other source they didn't say) of $39,763. Each of these is essential to putting a number on a casualty-loss deduction. And each is a problem here.

1.    *Loss of Value*

a.    *Competent Appraisal*

Richey and Cleary did not get an appraisal of their own home valuing it before and after the storm. Richey instead consulted a real-estate agent who provided them with Multiple Listing Service (MLS) printouts of other people's homes. This is a problem for many different reasons. The first, and on this point we believe Richey's testimony, is that he didn't talk to this agent until after the audit had begun. We conclude from this that the values reported on the return were not a

[*9] result of an appraisal, but rather of the couple's own estimate. And the MLS printouts are not an appraisal at all, but rather a rationalization of the couple's guess about the before and after values of their home.[6]

It's not impossible for a homeowner to conduct an appraisal himself—but he has to show sufficient knowledge of the property and its value immediately before and after the casualty event. In *Coates*, 112 T.C.M. (CCH) at 474, we found that a landowner who had worked on his ranch for more than 30 years did have sufficient knowledge to adequately appraise it—especially since he also had substantial experience in buying and selling property in the surrounding county.

We don't find a similarly granular knowledge of a local market here. Richey and Cleary had their primary residence in suburban D.C. and they did not spend most of their time at their vacation home. They also produced no evidence of their awareness of market conditions in Stone Harbor. *See id.* What we got were photographs of MLS printouts. Two were printouts for properties that Richey claimed were comparable to their home before the storm—the first of which showed a sale price of $2,526,950 from April 2017; and the second of which showed a sale price of $2,125,000 from December 2017. Richey then adjusted those prices himself because he said these comparables were smaller and, he claimed, his home was in a more desirable area. These adjustments let him come up with a "before" value of his own home of $2,677,650.

He also pointed to two other properties that he referred to as "lot-value (tear-down)" properties. The purchase prices for these two properties were $1,790,000 and $1,640,000. He argues that these two properties are good comparables for the home's "after" value, and justify a $1,994,175 after-storm value because the "flood events and future threat required the property to essentially be rebuilt or totally renovated." We do not find this to be a persuasive appraisal. We infer from Richey's having to reach out to an agent to give him such comparables an unspoken admission that he is not qualified to conduct an adequate appraisal on his own. We also can't believe the assertion that the storm damage and fear of future flooding rendered their

---

[6] In other words, the MLS printouts are akin to the rational tail of the intuitive dog that is the couple's initial valuation of their home. *See* Jonathan Haidt, *The Emotional Dog and Its Rational Tail: A Social Intuitionist Approach to Moral Judgment*, 108 Psychol. Rev. 814, 822–23 (2001). It was not derived from those MLS printouts (in fact it resembles more of an intuitive evaluation); those printouts serve as a *post hoc* rationalization of their evaluation.

**[*10]** vacation home a teardown. Richey claimed that no one would buy their home after the storm without considering the cost of a total rebuild of "the retaining walls (from the sea), dock system, and foundation of the home, which suffered significant erosion." We likewise note that he never provided evidence that the damage to the retaining wall or the home's foundation was storm damage rather than damage from erosion and ordinary wear and tear. And if their home's value declined after the storm because of fears of future storm damage, we'd need to exclude that factor from valuing the casualty loss. *See* Treas. Reg. § 1.165-7(a)(2)(i). On this record we have no way of doing so.

In the end, we find there to be no adequate appraisal of the before and after values of the house. The MLS printouts provided no actual valuation of the vacation home. And even if we found there to have been an adequate appraisal, the fact that the appraisal considered market shifts due to the fear of future flooding would by itself render it inadequate.

b.     *Cost of Repairs*

Appraisals are not always necessary, however. Richey also introduced evidence of the cost of repairing the home. He contends that the total cost of repairs after the storm was more than $250,000—for just the first phase. He claimed that he would need to spend even more during a second phase of repairs whose additional cost would amount to another $150,000.

**[\*11]**  We summarize:[7]

| Evidence Provided | Cost Attribution |
|---|---|
| Channel Marine Construction Invoice | $135,809.85 |
| Dennisville Fence Work Invoice | 8,292.00 |
| Stonewood Builders Work Invoice | 89,964.76 |
| Oliver Architects Invoice | 11,132.83 |
| Waters Edge LLC Invoice | 5,675.99 |
| DL Minor Construction Estimate | 207,811.88 |

A problem with these receipts and estimates are that many include items less related to restoration than to improvement. One estimate, for example, included the cost of building a deck and installing a pool, neither of which had been part of their home before the storm. The construction permit that Richey introduced showed not just a new pool, but 25.5 linear feet of vinyl or steel bulkhead 24 inches waterward of the existing bulkhead, and two 10 linear feet of bulkhead returns.[8]

Such estimates of possible future repairs are not persuasive proof of the actual incurred cost of actual repairs. *Farber*, 57 T.C. at 719. This

---

[7] The Commissioner argues that the actual cost of construction amounts to only $173,227 as he argues that this is the amount that the couple has actually paid for repairs. Actual payment is not quite the test here: We instead look to whether the cost of repairs actually made is persuasive evidence of a change in value due to the casualty. *See Farber*, 57 T.C. at 719.

[8] A bulkhead is a "hard armor technique usually vertical that maintains soil and abates erosion from waves and currents using rigid materials." And a return wall is a "section of bulkhead that extends towards land, typically from the end of a shore-parallel bulkhead, and ties into the bank or backshore." J. Johannessen, et al., *Marine Shoreline Design Guidelines* xiv, xix (2014), https://wdfw.wa.gov/sites/default/files/publications/01583/wdfw01583.pdf.

**[\*12]** means that the maximum recovery the couple could substantiate from the receipts is $250,875. And these repairs included work that went beyond restoring the vacation home to its pre-storm condition; a new and improved bulkhead, and a pool are home improvements, not repairs. Richey even admitted in his posttrial brief that $51,600 of his cost of repairs was for these improvements.

But there are problems even with any lower number, because taxpayers still have the burden of proving that the cost of repairs is sufficient evidence of the extent of the casualty loss. Treas. Reg. § 1.165-7(a)(2)(ii). This would first mean showing that the repairs were necessary to restore the property to the condition that it was in immediately before the storm. *Id.* Richey and Cleary never provided any evidence of the state of their property immediately before or after the storm. Without knowing their home's "before" condition, we cannot find it more likely than not that any repairs were incurred to restore it.

Second, Richey and Cleary had the burden of proving that the repairs did not remedy more than the storm damage that was suffered from the storm. *See id.* Richey's decision to include more than $50,000 for a new pool and better bulkhead affects our view of his credibility on the question of whether the remainder of his claimed costs were really for repairs rather than improvements.

There is also, and finally, the question of whether the repairs would cause the home's value to exceed its value immediately before the storm. *Id.* Here again, the absence of any evidence about the home's condition immediately before the storm makes it impossible to determine if the repairs rather exceeded that value.[9]

Richey and Cleary provided receipts that total $250,875 in actual expenditures. They admit that $51,600 of these expenses improved the property rather than repaired it, and did not give us enough evidence about how their home looked before the storm to bear their burden of showing that the remaining expenses were not also the costs of improvement or repair of nonstorm damage or wear and tear. With this we conclude that they have failed to substantiate the amount of their loss.

---

[9] Richey and Cleary also had the burden of proving that the amount spent for the repairs was not excessive. *See* Treas. Reg. § 1.165-7(a)(2)(ii). The Commissioner never contested that the cost of the repairs themselves were excessive, however, and there is no evidence to suggest that it was.

**[\*13]**     2.     *Basis*

The Code also limits the amount of a casualty loss to a taxpayer's adjusted basis in the damaged property. Without proof of this basis, we will not sustain a deduction. *Millsap v. Commissioner*, 46 T.C. 751, 760 (1966), *aff'd on other grounds*, 387 F.2d 420 (8th Cir. 1968). Richey first stated that his home's basis was $2,450,000, but then testified that he and his wife bought the home for $2,400,000; that is, until he was confronted with a purchase contract that showed a price of only $2,250,000. We won't say this is a failure of proof of basis, but it is a failure of proof of basis of anything over $2,250,000.

3.     *Insurance*

The Code tells us to reduce the amount of any casualty loss by the amount of insurance that did or could have reimbursed the taxpayer for the damage that he suffered. Richey and Cleary listed on their return a reimbursement of $39,763. They never introduced any information about the source of this reimbursement, and no evidence of an insurance policy or claims that they made. Richey did testify that they had an insurance policy on the home when the storm hit but that he filed no claim because the processing of a claim he made for damage from Superstorm Sandy in 2012 was so unsatisfactory that he didn't want to try again. He also assured us that had he submitted a claim, his policy would have covered only a small portion of the damage.

That's not good enough. The law is clear that taxpayers who have an insurance policy on damaged property must file a timely claim or they don't get a casualty-loss deduction. § 165(h)(4)(E). Though the couple reported receiving some kind of reimbursement for damage to their home, Richey made clear that it was not from their homeowners insurance. That the couple had an insurance policy and failed to file a claim is by itself another reason to deny them any casualty-loss deduction for the home.

B.     *The Boat*

Richey and Cleary fare no better on the loss they claim for their boat.

1.     *Loss of Value*

Richey's approach to showing the before and after value of the boat was as unpersuasive as his approach to showing his home's loss of

[*14] value. To substantiate the boat's loss of value, Richey gave us NADA[10] values of boats that he said were similar, both before and after the storm, to his own. He relied on these values as proof that his own boat's value dropped from $364,550 before the storm to $184,780 afterward. What he did was look up NADA values of boats he said were similar to his own. He looked especially for the values of well-maintained boats as helpful for determining the "before" value and the values of damaged boats for the "after" value. But it was all Richey's say-so: We got no documentary proof of his NADA research and no evidence of his own boat's condition before or after the storm. Without such proof, we cannot find there is sufficient evidence in the record of the boat's actual pre- and post-storm value.

### 2. *Basis*

There were also problems with the claimed basis of $480,000. In lieu of an actual receipt or purchase contract to show actual basis in the boat, Richey offered an MSRP price sheet from 2007, one year before he and his wife bought it. Though the value listed on the price sheet was $414,488 MSRP, and the advertised sale price for the boat showed a discount to $344,025, he claimed that he bought it for $480,000 because he had added pricey options. But as proof we have only his own general testimony. He did not specify what the options were or their cost. Without receipts, and with some trouble with his credibility, we find that the couple has failed to prove their claimed basis in the boat.

Richey did introduce a listing agreement that he and his wife entered into with a marina to sell the boat for $189,500. But he testified that the highest offer they received was only $150,000. Listing prices are in general unpersuasive proof of actual market value, and this testimony confirms that this particular listing price is inadequate evidence here. *See Hale*, 44 T.C.M. (CCH) at 1119. It is certainly not sufficient proof of the storm's effect on the boat's value.[11]

---

[10] NADA stands for National Automobile Dealers Association. It is an organization that collects data and provides estimates of the cost of buying a pre-owned vehicle that reflects factors such as condition, mileage, and type of vehicle. NADA provides similar values for boats. *NADAguides Used Car Values vs. Kelly Blue Book*, Kelly Blue Book, https://www.kbb.com/nadaguides/ (last visited Jan. 25, 2023).

[11] At trial Richey claimed that he and his wife received estimates of the cost of repairs from Sea Ray, but they introduced no documentary evidence that they had.

**[\*15]**    3.    *Insurance*

Richey asserted that the marina where he stored the boat during the storm also had insurance that covered some of the damage. Though he did not report receiving any reimbursement from the marina, he did state that he began the process collecting reimbursement. But we again got no documentation of these efforts. Richey explained that this absence of evidence was due to the "personal" nature of his attempt to collect—an appeal to his relationship with the marina's owner. But with no corroborating emails, letters, or testimony, we find it more likely than not that there was in fact no such attempt. *See House*, 69 T.C.M. (CCH) at 2025.

There was unusual difficulty even in figuring out whether the couple had their own insurance policy on the boat. They produced an insurance policy in effect from May 2008 to May 2009. Richey testified that at one point the boat had a lien on it to secure a loan. This loan required there to be insurance on the boat for the life of the loan. Richey then claimed that he believed that he'd paid off the loan and that the insurance had expired before the storm, yet the listing agreement that he signed after the storm identified the lien as a current liability. We conclude from this that it was more likely than not that the boat was insured at the time of the storm.

That likely means that there were two insurance policies Richey could have turned to for reimbursement of any storm damage, yet he did not submit a claim. The failure to file a timely claim is yet another reason to deny a casualty-loss deduction. *See* § 165(h)(4)(E).

V.    *Conclusion*

Richey and Cleary have thus failed to prove that Stella caused damage to either their vacation home or boat. Even if they had, they did not give us sufficient evidence to substantiate the value of their losses. Even if they had substantiated the value of those losses, they did not give us sufficient evidence of their basis in the boat. And even if they had proved that the basis limitation did not apply, they filed no insurance claims for property that was protected by insurance. All these attacks by the Commissioner have picked completely clean the flesh of their claimed deduction, and

*Decision will be entered for respondent as to the deficiency and for petitioners as to the accuracy-related penalty under section 6662(a).*