EDWARD J. and RUTH G. TYBUS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tybus v. Commissioner
Docket Nos. 4121-86; 1750-87.
United States Tax Court
T.C. Memo 1989-309; 1989 Tax Ct. Memo LEXIS 296; 57 T.C.M. (CCH) 796; T.C.M. (RIA) 89309; June 26, 1989. Raymond M. Pezzo and James P. Constantino, for the petitioners. Gerald A. Thorpe, for the respondent. POWELL
MEMORANDUM OPINION POWELL, Special Trial Judge:[1] Respondent determined deficiencies in petitioners' 1983 and 1984 Federal income tax liabilities in the amounts of $ 2,285.99 and $ 1,660.00, respectively. [2] The issues for decision are: (1) whether stock options traded by Edward J. Tybus (petitioner) were capital assets under sections 1221 and 1234; [3] (2) whether petitioner's stock option trading during 1983 and 1984 qualified as a trade or business under section 162; and (3) whether petitioner substantiated his 1984 investment interest deduction in the amount of $ 15,276.00. *299 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein. Petitioners resided in Red Hook, New York when they filed their petition. From 1980 through 1984, petitioner reported income (losses) from the following sources: Bar/
Rental
Year
Options
Stock
Dividends
Interest
Hotel
Property
1980
$   19,203 $ (2,955)
$ 29,087
$ 4,885
$  6,113
$   (157)
1981
(220,279)
(3,000)
20,493
1,057
2,249
(1,898)
1982
491,977 60,103 11,630
877
1,023
4,242 1983
(991,040)
[4] 45,776 3,826
3,822
13,932
9,541 1984
(106,937)
6,398 4,061
796
23,409
-0- Total
$ (807,076)
$ 106,322 $ 69,097
$ 11,437
$ 46,726
$ 11,728 Option Trading
The issues in dispute center on petitioner's stock option trading. Generally, an option gives the owner the right to buy ("call") *300 or sell ("put") the underlying shares of stock at a fixed price within a specified period of time. Petitioner testified that he began trading options in 1980 because his hotel business was not as lucrative as he had anticipated, and therefore "it was incumbent upon me to find a more dependable source of income." He had purchased and sold stocks and bonds since 1937, and by 1983 had amassed an investment portfolio valued at approximately $ 280,000. He believed that he could utilize his knowledge of the stock market in his option activities. From 1980 through 1984, petitioner reported option trading as follows: Sale
Income (Loss)
Year
Transactions [5]
Cost
Proceeds
Before Expenses
1980 * $    79,032
$ 97,525
$   19,203 1981 * 505,535
312,539
(220,279)
1982 * 2,589,706
3,082,890
491,977 1983
50
1,339,985
350,040
[6] (989,945)
1984
14
123,658
17,536
[7] (106,302)
*301 As a result of the losses he sustained, in 1985 petitioner ceased his option trading. Most of the options traded by petitioner did not extend beyond six months, and many expired within three months. Because the options could not be purchased on margin, petitioner purchased all of his options with cash. Petitioner did not maintain a separate bank account for his options, explaining that there was no need for one because his option broker automatically funneled funds to and from his money market account and his investment account. During 1983 and 1984 petitioner spent approximately 45 to 50 hours per week engaged in financial activities, such as calling his broker (Charles Schwab & Co., Inc.), listening to market reports and reading financial papers and magazines. He conducted most of these activities from his office in a small hotel that he owned jointly with his mother. Petitioner has never held a license to sell stocks, bonds, options or any other types of securities, and has never traded options for third parties. Petitioner recorded his option trades on a clipboard, which he later checked against his brokerage statements. Although he did not purchase options every *302 day during 1983 and 1984, petitioner maintained at least one "open" position during this period. He did not, however, maintain any open positions on December 31, 1983, or December 31, 1984. Prior to filing his 1982 tax return, petitioner reported his option transactions as capital gains or losses. After consulting with an accountant in 1983, petitioner reported his option income in 1982 and his option losses in 1983 and 1984 as ordinary income or losses on his tax returns. Petitioner also filed amended returns for 1980 and 1981 recharacterizing his option income (losses) as ordinary income (losses) from a trade or business. Investment Portfolio
Petitioner made his first stock purchase in 1937, and subsequently developed a long-term investment portfolio of stocks and bonds. He engaged in nine stock transactions and one government security sale in 1983, and eight stock transactions in 1984. One of petitioner's two investment accounts was with Charles Schwab & Co., Inc., the same broker petitioner used for his option trading. Petitioner funded his option activity with the principal and income he had earned from his investment portfolio. As a result of his option losses, *303 the market value of petitioner's investment portfolio decreased from $ 278,225 at the end of 1983 to $ 65,000 at the end of 1984. Petitioner incurred investment interest expenses in 1984 in the amount of $ 15,276 to maintain the margin account he used to purchase his stock investments. In addition to managing his own investment accounts, petitioner also managed, without remuneration, his mother's and stepfather's investment accounts, and occasionally gave stock market advice to friends. Other Income
In addition to his option and investment portfolio activities, petitioner and his family operated the Hotel Rhinecliff, and eight-room hotel, restaurant and bar. Petitioner normally devoted two to three hours per day attending to the hotel's business; petitioner's wife and mother, with the help of petitioner's children, were primarily responsible for the daily operation of the hotel. Petitioner reported ordinary income from the hotel for 1983 and 1984 in the amounts of $ 13,932 and $ 23,409, respectively. During 1983 petitioner also received rental income of $ 9,541 from two pieces of property he owned. He spent less than ten hours per week managing these properties. He *304 eventually sold the properties in 1983, and used the proceeds for his financial activities. Petitioner stipulated that, aside from his financial activities, he had sufficient income from other sources during 1983 and 1984 to maintain a living. OPINION The two primary issues for decision are: (1) whether petitioner's options were capital assets, and (2) whether, during 1983 and 1984, petitioner's option trading qualified as a trade or business. Petitioner claims that his options were noncapital assets, and that his option trading was a trade or business. Respondent takes a contrary position on each issue. We agree with respondent on both issues. Capital Asset
Section 1234(a)(1) provides the general rule for the treatment of option gains and losses: (1) General Rule. -- Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, an option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option relates has in the hands of the taxpayer *305 (or would have in the hands of the taxpayer if acquired by him). Options that constitute property described in section 1221(1) are excluded from this general rule. Sec. 1234(a)(3)(A). Thus, the initial issue is whether petitioner's options fall within the ambit of section 1221(1). [8]
Section 1221(1) defines a "capital asset," inter alia, as: * * * property held by the taxpayer (whether or not connected with his trade or business), but does not include -- (1) stock in trade of the taxpayer or other property of a kind which would properly be *306 included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *. [Emphasis added.] Petitioner argues that his options qualify under section 1221(1) either as "stock in trade" or "inventory." In making this argument, petitioner submits that neither of these two classifications require that the options be held "for sale to customers." The language "to customers" was added to the predecessor to section 1221(1) (section 117 of the Revenue Act of 1934) to exclude from the definition of a capital asset only those securities bought and sold by "dealers". The history of this provision has been explained in Wood v. Commissioner,16 T.C. 213, 219-220 (1951), and more recently in King v. Commissioner,89 T.C. 445, 457-458 (1987), and need not be repeated here. In Wood, this Court held that property must be held for sale to customers, i.e., as a dealer, before it can be classified as stock in trade or inventory. *307 [9]Wood v. Commissioner, supra at 225-226; see also Adnee v. Commissioner,41 T.C. 40, 43 (1963). As noted by the Second Circuit, "[securities] could not be classified as stock in trade or property subject to inventory unless they were held by the taxpayer primarily for sale to customers in the ordinary course of his business." Van Suetendael v. Commissioner,152 F.2d 654 (2d Cir. 1945), affg. a Memorandum Opinion of this Court. Whether securities are held primarily for sale to customers is a question of fact, with the crucial phrase being "to customers." *308 Kemon v. Commissioner,16 T.C. 1026, 1032 (1951). Petitioner had no option customers, nor did he ever possess a license to buy or sell options for others. See Mirro-Dynamics Corp. v. United States,374 F.2d 14, 15-16 (9th Cir. 1967). All of his option trading was for his own account and was executed through a broker. Petitioner, however, maintains that his options were not capital assets, and attempts to distinguish his case from the great weight of judicial authority based on the "unique combination of factors" present here, specifically, 1) the nature of his activities, 2) the type of property involved, and 3) the nature of the income petitioner intended to derive from his trading. The proper classification of a loss does not depend upon the number of transactions or the degree of trading activity. Rather, it depends on whether the securities constitute "capital assets" within the meaning of section 1221. Adnee v. Commissioner, supra at 42. The factors present here do not warrant an exception to the well-established principle that property must be sold "to customers" to fall within the scope of section 1221(1). Compare *309 Arkansas Best Corp. v. Commissioner,485 U.S. 212 (1988). Consequently, the exception contained in section 1234(a)(3)(A) does not apply, and the character of the options is determined by the character of the underlying stock. Sec. 1234(a). The underlying stock is also a capital asset because petitioner was not a dealer in stock. Thus, petitioner's option transactions are subject to capital gain or loss treatment. See Arkansas Best Corp. v. Commissioner, supra;Adnee v. Commissioner, supra at 42-43. Trade or Business
Our holding that petitioner's options were capital rather than ordinary assets effectively disposes of petitioner's claimed ordinary loss deductions. We still must decide, however, whether expenses of $ 1,095 in 1983 and $ 635 in 1984 are deductible from gross income under section 162(a) or qualify as itemized deductions under section 212(1). [10] While both sections allow a deduction for ordinary and necessary expenses, section 162(a) requires that the expenses be paid or incurred in carrying on a trade or business, [11] whereas section 212(1) requires only that the expenses be paid or incurred for the production *310 of income. Petitioner bears the burden of proving that the expenses are deductible under 162(a). Rule 142(a). Resolution of this issue often turns on whether the taxpayer's activity constitutes a "trade or business." However, we need not decide this question because petitioner has failed to prove that the expenses claimed were incurred for his option activity. Here, all but $ 3 of petitioner's claimed expenses are for "dues and publications." We assume these expenses reflect the cost of various financial publications. However, there is nothing in the record to indicate whether *311 petitioner utilized these publications for his stock investments, option activity, or both. Petitioner does not contend that his involvement with his stock investments constitutes a trade or business. Similarly, petitioner has failed to prove that the $ 3 he claimed in 1983 as "interest on business indebtedness" was incurred for his option activity. As a result, petitioner's expenses are deductible only under section 212(1). Interest Deduction
The only issue remaining is whether petitioner substantiated his 1984 investment interest deduction of $ 15,276. [12] Petitioner testified that this interest amount was reflected on his brokerage statements. Given the nature of his investment activities, we found petitioner's testimony to be credible, and allow him interest deduction in the amount claimed. Decisions will be entered under Rule 155.
Footnotes
1. This case was assigned pursuant to the provisions of section 7443A(b)(1) and Rule 180 et seq. All statutory references are to the Internal Revenue Code of 1954, as amended, and as in effect for the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise provided. ↩
2. Respondent has conceded that petitioners are not liable for additions to tax under sections 6653(a)(1) and (2) for 1983 and 1984. ↩
3. In describing petitioner's option activities we use the word "trade" solely to describe petitioner's option purchases and sales, and not to characterize the tax consequences of petitioner's option activities.↩
4. This amount represents $ 111,194 long-term capital gain from the sale of two rental properties plus a $ 1,298 short-term capital gain from the sale of a government security, less the 60 percent capital gain deduction in effect.↩
5. Each option transaction gave rise to several contracts that enabled the option purchaser to acquire shares of common stock. The contracts per transaction ranged from 5 to 2,000 in 1983 and 2 to 547 in 1984. ↩
6. Petitioner's $ 989,945 gross option loss together with $ 1,095 in claimed option expenses results in a net option loss of $ 991,040. ↩
7. Petitioner's $ 106,302 gross option loss together with $ 635 in claimed option expenses results in a net option loss of $ 106,937. * Information not contained in record.↩
8. Petitioner alleges that he never intended to buy the stock underlying the options, and therefore argues that the options themselves should be viewed as economic units "for which there is no test under Sections 1221 and 1234." Petitioner cites no authority to support his argument. Moreover, the parenthetical at the end of section 1234(a)(1) makes the intent to buy the underlying property irrelevant. In any event, petitioner proceeds to argue that his options fall within section 1221(1)↩, which is the point where we begin our analysis.
9. The "dealer" language also has been incorporated into the regulations that pertain to options. Section 1.1234-1(d), Income Tax Regs., provides that: Any gain or loss realized by a dealer in options from the sale or exchange of an option to buy or sell property is considered ordinary income or loss under paragraph (a)(3) of this section. A dealer in options to buy or sell property is considered a dealer in the property subject to the option.↩
10. Resolution of this issue will not affect petitioner's self-employment tax liability, as respondent contends. See section 1402(a)(3)(A); compare Miller v. Commissioner,77 T.C. 97↩ (1981). 11. The parenthetical language of section 1221 ("whether or not connected with his trade or business") clearly contemplates the possibility of a capital asset being acquired for business as opposed to investment purposes. See Arkansas Best Corp. v. Commissioner,485 U.S. 212↩ (1988).
12. Respondent concedes that petitioner has not exceeded the limitation on the deduction for "investment interest" provided in section 162(d)↩.