LEWIS FURER AND MARTHA IRENE FURER, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Furer v. Commissioner
Docket No. 15493-90
United States Tax Court
T.C. Memo 1993-165; 1993 Tax Ct. Memo LEXIS 166; 65 T.C.M. (CCH) 2420; April 15, 1993, Filed *166 Lewis Furer, pro se. For respondent: Carl D. Inskeep. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6653(a)(1)(A)
6653(a)(1)(B)
6661
1985
$ 8,282
414
[1]
--  --
$ 2,071
1986
150,942
--
--
$ 7,547
[2]
37,323
1987
89,030
--
--
4,452
[3]
22,258
After concessions by respondent, the only amounts remaining in dispute are a deficiency of $ 40,768 and additions to tax under sections 6653(a)(1)(A) and (B) for 1986. The issues for decisions are: (1) Whether petitioners are entitled to an ordinary loss deduction, as a casualty loss, for losses incurred as a result of the October 19, 1987, stock market crash. We hold *167 that they are not. (2) Whether Lewis Furer (petitioner), qualifies as a dealer in stock, so that the losses incurred upon the liquidation of his stock holdings as a result of the October 19, 1987, stock market crash would be treated as ordinary losses rather than capital losses. We hold that he does not. (3) Whether petitioners are liable for additions to tax under section 6653(a)(1)(A) and (B) for the 1986 tax year because their underpayment of tax for that year was due to negligence. We hold that they are not. All section references are to the Internal Revenue Code in effect for the years in issue, unless otherwise indicated, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are incorporated herein by reference. Petitioners were residents of Anaheim, California, when the petition in this case was filed. Petitioner began investing in stocks in 1957 while working as an engineer. In 1961, petitioner retired from his engineering career and became a stockbroker in order to pursue his stock transactions full time. At all times relevant to this case, petitioner was employed as a stockbroker *168 by Bateman Eichler, Hill Richards (Bateman Eichler). Petitioner's position at Bateman Eichler provided him with the opportunity to research the stocks he traded on his own account and to use that research to make recommendations to select clients. Petitioner was registered by the New York Stock Exchange, the American Stock Exchange, and the National Association of Securities Dealers (NASD) as a "Registered Representative". However, he was not registered as a securities dealer with the Securities Exchange Commission, NASD, or the State of California. Petitioner did not advertise as a securities dealer nor did he hold himself out in any way as a dealer in securities. All of petitioner's stock transactions for the years at issue were made through Bateman Eichler. Bateman Eichler located purchasers and sellers for petitioner and arranged the transactions. Petitioner had no direct contact with the purchasers or the sellers of his stocks. Petitioner did not have any employees or salesmen working for him. Petitioner studied the market and chose stocks to purchase and sell on the stock exchange. He intended to make money by capitalizing on the rising value of stocks on the stock *169 exchange. Petitioner financed his stock purchases with a substantial amount of debt, using both his margin account at Bateman Eichler and loans from banks. Shortly before October 19, 1987, petitioner had stock holdings with a market value of approximately $ 8 million in which he had equity of approximately $ 3 million. On October 19, 1987, the stock market went into a steep decline, and the Dow Jones Industrial Average dropped over 500 points by the end of the day. As a result, petitioner's stocks lost a substantial amount of their value. Petitioner lost all of his equity in his stock holdings, and Bateman Eichler liquidated his holdings to protect their security interest. After the crash and the liquidation of the stocks, petitioner no longer had any stock holdings and had personal liabilities of over $ 600,000. In December 1987, petitioners filed for bankruptcy under Chapter 7 of the Bankruptcy Code, and in 1988 their personal liabilities were discharged. Petitioner thought that there might be a way to carry back his losses to previous years to apply against income taxes he had paid for those years, so he sought the advice of an accountant. However, because he had no money *170 to pay the accountant, the consultation was limited to a 15-20 minute conversation. On their original returns for the years 1960 through 1986, petitioners consistently treated their stock transactions as investment transactions, reporting the gains and losses on Schedules D as capital gains and losses and treating their investment interest expenses as subject to the investment interest limitation. As a result of his conversation with the accountant and additional research on his part, petitioner determined that he and his wife should have been filing Schedules C rather than Schedules D with their returns to report the gains and losses on their stock transactions. Subsequently, petitioners filed amended returns for the years 1984 through 1986, treating their stock transactions as trade or business activity and treating their interest expenses as trade or business expenses. Petitioner received refunds for each of those years. On May 16, 1988, petitioners filed their return for 1987, treating their stock transactions as trade or business transactions and characterizing their stock losses as ordinary losses. As a result, petitioners had a net operating loss which they carried back *171 to 1986 by filing a second amended return. Based on the two amended returns for 1986, petitioners received total refunds of $ 127,212, the entire amount of tax paid for 1986. On April 13, 1990, respondent issued a notice of deficiency for petitioners' 1985, 1986, and 1987 tax years. Respondent concluded that petitioners were investors in stock rather than in the trade or business of dealing in stock. Therefore, respondent treated the gains and losses from petitioners' stock transactions as capital gains and losses, and treated petitioners' interest expenses as subject to the investment interest limitation. Respondent now concedes that petitioner's stock activities were a bona fide trade or business and that petitioners have no deficiencies for 1985 and 1987. The 1986 deficiency remaining after concessions by respondent in the amount of $ 40,768 arises solely from the alternative minimum tax computation. OPINION Treatment of Stock Losses
Section 165(a) and (c)(1) allows a deduction for losses incurred in a trade or business, in which category the parties agree petitioners' losses fall. However, there are limitations on the deduction allowed by section 165(a). In order *172 for a loss to be deductible under section 165(a), it must be the result of a closed transaction. Sec. 1.165-1(b), Income Tax Regs. In addition, section 165(f) permits deductions for losses on the sale or exchange of capital assets as defined in section 1221 only to the extent allowed by sections 1211 and 1212. Petitioners argue that the losses they suffered as a result of the stock market crash of October 19, 1987, are casualty losses and, therefore, are ordinary losses which can be carried back as part of their net operating loss for 1987 under section 172. In essence, petitioners are arguing that the occurrence of the casualty, the stock market crash, closed their transaction and triggered the deduction. In addition, petitioners argue that they are entitled to ordinary losses on their stock losses because petitioner was a dealer in stock and, therefore, the stock was inventory under section 1221(1). In order to analyze petitioners' arguments, we must take into account the nature of the transactions that gave rise to their losses. There were two components to petitioners' stock losses due to the October 19, 1987, stock market crash: (1) The decline in value of petitioners' *173 stock holdings, and (2) the liquidation of the stock holdings to cover petitioners' secured debts. We consider each of those components separately. The decline in the value of petitioners' stock does not give rise to a deduction, either ordinary or capital, because there was no closed transaction. Under section 1.165-4(a), Income Tax Regs.: No deduction shall be allowed under section 165(a) solely on account of a decline in the value of stock owned by the taxpayer when the decline is due to a fluctuation in the market price of the stock or to other similar cause. A mere shrinkage in the value of stock owned by the taxpayer, even though extensive, does not give rise to a deduction under section 165(a) if the stock has any recognizable value on the date claimed as the date of loss. No loss for a decline in the value of stock owned by the taxpayer shall be allowed as a deduction under section 165(a) except insofar as the loss is recognized under sec. 1.1002-1 upon the sale or exchange of the stock and except as otherwise provided in section 1.165-5 with respect to stock which becomes worthless during the taxable year.
Petitioners argue that their losses were not due to *174 a mere decline in the market value of their stock but were due to the stock market crash, which was sudden, unexpected, and unusual. Petitioners contend that the term "decline" contemplates a gradual event, and the suddenness of the crash places their circumstances outside the ambit of the regulation and within the ambit of the general casualty loss provisions. If petitioners are correct, they have a closed transaction and are entitled to an ordinary loss for their stock losses. Sec. 1.165-7(a)(1), Income Tax Regs.
We conclude that the term "decline" does not necessarily contemplate a gradual event. The regulation focuses on the fact that the loss is due only to a change in market value, not on the speed at which the loss is incurred. According to the regulation, "A mere shrinkage in the value of stock owned by the taxpayer, even though extensive, does not give rise to a deduction under section 165(a) if the stock has any recognizable value on the date claimed as the date of loss." (Emphasis added.) Sec. 1.165-4(a), Income Tax Regs. There is nothing in the regulation which indicates that the shrinkage in value must be gradual in order for the regulation to apply. Moreover, *175 even if the regulation did not preclude the deduction of petitioners' losses, those losses would not qualify for treatment as casualty losses. In order for a loss to qualify as a casualty loss it ordinarily must be the result of physical damage to the taxpayer's property. Pulvers v. Commissioner, 407 F.2d 838 (9th Cir. 1969); Thornton v. Commissioner, 47 T.C. 1 (1966). In the case before us, there is no physical damage to petitioners' stock holdings, nor could there be in the case of petitioners' stock or other nonbearer financial instruments. Therefore, petitioners did not have casualty losses. We now consider the liquidation component of petitioners' stock losses. Petitioners are entitled to a loss under section 165(a) and (c)(1) on the liquidation of their stock because the liquidation is a sale or other disposition of property and is, therefore, a closed transaction. Sec. 1001(c). However, under section 165(f), their losses are not treated as ordinary losses because the stock did not constitute inventory or property held "primarily for sale to customers in the ordinary course of his trade or business" within *176 the meaning of section 1221(1). Petitioners argue that petitioner was a dealer in securities by virtue of his long-term and intensive involvement in his securities business and that their stock holdings could not be considered anything other than inventory. The determination of whether petitioner was a trader or dealer is a question of fact. Kemon v. Commissioner, 16 T.C. 1026, 1032 (1951). In Kemon, we described the difference between traders and dealers as follows: Those who sell "to customers" are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. * * * Such sellers are known as "dealers." Contrasted to "dealers" are those sellers of securities who *177 perform no such merchandising functions and whose status as to the source of supply is not significantly different from that of those to whom they sell. That is, the securities are as easily accessible to one as the other and the seller performs no services that need be compensated for by a mark-up of the price of the securities he sells. The sellers depend on such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost. Such sellers are known as "traders." [Id. at 1032-1033.]
On the facts before us, we find that petitioner fits the description of a trader rather than a dealer. Petitioner was not licensed as a dealer, nor did he advertise or hold himself out as a dealer. Moreover, all of his stock transactions were handled through Bateman Eichler. See Mirro-Dynamics Corp. v. United States, 374 F.2d 14 (9th Cir. 1967) (securities sales by taxpayer who was not licensed to sell securities held not for sale to customers); Michelson v. Commissioner, T.C. Memo. 1990-27, affd. 951 F.2d 288 (10th Cir. 1991) *178 (taxpayer who was not licensed to sell commodities and whose transactions were handled through a broker held not to be a dealer in commodities); Tybus v. Commissioner, T.C. Memo. 1989-309 (taxpayer who was not licensed to sell options and whose option trading was executed through a broker held not to be a dealer in options); Huebschman v. Commissioner, T.C. Memo. 1980-537 (taxpayer who was not licensed to sell securities and whose transactions were done on the taxpayer's private account through a broker held not to be a dealer in securities). In addition, the facts demonstrate that petitioner did not perform a merchandising function in selling his stocks. He did not locate the sellers or purchasers of his securities and depended on an increase in the value of his stock, rather than a mark-up, to make a profit on his transactions. Finally, petitioner did not have a source of supply that was different from his purchasers. All of his transactions, purchases as well as sales, took place on the stock exchange. The purchasers of petitioner's stock had the same access to stocks sold on the exchange as petitioner. We therefore *179 hold that petitioner was a trader in stock, not a dealer in stock, and his stock holdings were not inventory held primarily for sale to customers. Consequently, under section 1221, petitioners' stock holdings were capital assets, and their deduction for losses on the sale or exchange of those capital assets is limited by sections 1211 and 1212. In addition, those losses cannot be included in petitioners' net operating loss carryback under section 172(d) and cannot be used to offset petitioners' 1986 tax liability. Additions to Tax
Respondent determined that petitioners are liable for additions to tax for 1986 under sections 6653(a)(1)(A) and (B), and 6661. Respondent has now conceded the addition to tax under section 6661. Section 6653(a)(1)(A) and (B) imposes additions to tax if any underpayment is due to negligence or disregard of rules or regulations. Negligence is defined as a "lack of due care or failure to do what a reasonably prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (citing Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). Respondent *180 argues that petitioners did not use due care or act as reasonably prudent persons because they only had a 15-to 20-minute casual conversation with an accountant prior to filing their amended returns. We disagree. At the time they filed their amended returns and received their refunds, petitioners were in bankruptcy and had no money to pay an accountant. It is reasonable to conclude that an accountant would not be willing to provide more than 15 or 20 minutes of counseling without being paid. Moreover, petitioner did not file his returns based solely on the advice of the accountant. He went to the library, did research on the tax law, and tried to understand the law and file his returns accurately. It is clear that petitioner did the best he could, and he should not be penalized for reaching the wrong conclusion. On the facts before us, we find that petitioners are not liable for additions to tax under section 6653(a)(1)(A) and (B). Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on $ 8,282.↩
2. 50 percent of the interest due on $ 149,293.↩
3. 50 percent of the interest due on $ 89,030.↩