T.C. Memo. 1996-529

UNITED STATES TAX COURT

EDWARD AND RUTH KELLY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 28233-91, 7795-94.          Filed December 2, 1996.

<u>Geoffrey J. O'Connor</u>, for petitioner Edward Kelly,

<u>Norman Trabulus</u>, for petitioner Ruth Kelly.

<u>Andrew J. Mandell</u> and <u>Lewis J. Abrahams</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined deficiencies in

petitioners'[1] Federal income tax, additions to tax and penalties

as follows:

_____

[1]During preparation of this opinion, counsel for petitioner
Ruth Kelly informed the Court of his client's death.  A motion to
substitute her estate as petitioner had not been received as of
the date of this opinion.

| | | Additions to Tax | | | Penalties |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1)(A)[2] | Sec. 6653(a)(1)(B) | Sec. 6661 | Sec. 6662 |
| 1986 | $64,061 | $3,203 | [1] | $16,015 | -- |
| 1987 | 48,593 | 2,430 | [2] | 9,713 | -- |
| 1989 | 26,496 | -- | -- | -- | $5,299 |
| 1990 | 12,425 | -- | -- | -- | 2,485 |
| 1991 | 41,064 | -- | -- | -- | 8,213 |
| 1992 | 55,580 | -- | -- | -- | 11,116 |

[1] Fifty percent of the interest due on $64,061
[2] Fifty percent of the interest due on $38,853.

After concession by respondent of an issue raised on behalf of petitioners at trial,[3] the issues for decision are:

(1)  Whether losses sustained by petitioner Edward Kelly (Mr. Kelly) in trading stock options should be characterized as ordinary or capital losses.  We hold that they were capital losses.

(2)  Whether brokerage commissions earned by Mr. Kelly in connection with his stock option trades may be treated as an offset against the amount of his trading losses rather than as ordinary income, and whether brokerage commissions paid by Mr. Kelly in connection with his stock option trades are

---

[2]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Respondent conceded that petitioners were entitled to deduct gambling losses in an amount equal to their gambling winnings for 1986, pursuant to sec. 165(d).

deductible as ordinary and necessary business expenses.  We hold that the earned commissions were taxable as ordinary income, and that the paid commissions are added to the basis of options purchased and treated as an offset to the price of options sold.

(3)  Whether petitioners were entitled to deduct certain unreimbursed employee business expenses.  We hold that the deductions were properly disallowed.

(4)  Whether petitioners are liable for additions to tax under sections 6653(a) and 6661 and accuracy-related penalties under section 6662(a), (b)(1) and (2).  We hold that petitioners are so liable.

(5)  Whether petitioner Ruth Kelly (Mrs. Kelly) is entitled to relief from liability as an innocent spouse.  We hold that she is not entitled to innocent spouse relief.[4]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.  Petitioners filed joint Federal income tax returns, as husband and wife, for each of the years at issue. At the time the petitions were filed, they resided in Brentwood, New York.

---

[4]On most issues petitioners have a conflict of interest. Mrs. Kelly joined her husband only with respect to issue (2).

Mr. Kelly has been a stockbroker for approximately 45 years. During the years at issue, he was employed full time by Shearson Lehman as office manager of its branch in Bay Shore, New York. Beginning in 1983, he also devoted considerable time to stock option trading for his own account. These trading activities and the market research that informed them would occupy at least 50 percent of a typical workday during this period. The annual volume of his option trades appears to have fluctuated between about 450 and 900 during the years at issue. Mr. Kelly was not a floor trader; he purchased options through a Shearson Lehman broker who had a direct wire to the floor of the exchanges. The amount of time he held the options varied from a few hours to a few weeks. The parties have stipulated that he did not hold any property as inventory or primarily for sale to customers in the ordinary course of his trade or business, did not sell to customers of his own, and performed no merchandising function with respect to his options transactions.

Mr. Kelly paid commission fees to Shearson Lehman in connection with the purchases and sales of options for his own account. As an employee, he received a 30-percent discount relative to the amount of commissions that a member of the public would pay. He also earned and received commissions as an employee in connection with his option trades. The commission

payments that he received represented compensation for bringing business to his employer.

Since 1979 Mr. Kelly has been registered with the Chicago Board of Options Exchange and the National Association of Securities Dealers, Inc. (NASD), as an "options principal". In this capacity he was authorized to approve customer accounts for options trading and oversee compliance with the rules of NASD and other rules concerning options transactions within the brokerage office. Mr. Kelly did not need to be a registered options principal in order to engage in any of his options trades; any Shearson Lehman customer satisfying certain financial and other criteria was qualified to trade options.

On their Forms 1040 for earlier taxable years not in issue, 1983 through 1985, petitioners reported Mr. Kelly's occupation as "stockbroker-dlr". The Schedule C filed with their return for 1983 describes his main business activity as "dealer in options". Nevertheless, for each of these years petitioners treated Mr. Kelly's net loss from options trading as a capital loss and reported it on Schedule D.

In February 1987, before the preparation of his tax return for 1986, Mr. Kelly read newspaper articles discussing the then recent decision of the U.S. Supreme Court in Commissioner v. Groetzinger, 480 U.S. 23 (1987). On the basis of these articles, he understood the case to stand for the proposition that where a

taxpayer carries on an activity continually and regularly with the intent of making a profit, he is engaged in a trade or business for tax purposes, and losses from the activity are deductible without limitation. He wondered whether Groetzinger affected the deductibility of the losses he incurred in his voluminous options trading. Mr. Kelly brought the case to the attention of Yale Auerbach (Auerbach), a certified public accountant who had regularly prepared his tax returns since the early 1950's. Auerbach read Groetzinger and told Mr. Kelly that it did not apply to his options trading; in the absence of authority to operate his own brokerage business, he would continue to be a trader for tax purposes, and must treat his losses as capital. Mr. Kelly informed Auerbach that he was a registered options principal, which meant that he was "registered to deal in options". Auerbach was unfamiliar with the nature of this position, but on further questioning, Mr. Kelly satisfied him that as a registered options principal he was qualified to establish his own office and "deal as any other broker does". Auerbach advised Mr. Kelly that under those circumstances he could adopt the position that he was engaged in a business and that the trading losses were ordinary. Subsequently, Mr. Kelly also consulted Carroll Baymiller (Baymiller), the attorney who had represented the taxpayer in Groetzinger. The record does not

disclose what Mr. Kelly told Baymiller, or what advice, if any, Baymiller rendered.

Auerbach prepared and signed petitioners' tax returns for 1986 and 1987. On Schedules C filed with their returns for these years, petitioners reported losses from options trading in the amounts of $108,318 and $100,917, respectively, and described Mr. Kelly's principal business as "options dealer". Auerbach's accounting practice was acquired by Russell T. Glazer (Glazer), who prepared and signed petitioners' tax returns for 1989 through 1992. In transferring petitioners' account to Glazer, Auerbach explained the reasoning behind the ordinary loss treatment of Mr. Kelly's options trading. On Schedules C filed with their returns for those years, petitioners reported ordinary losses from options trading of $82,253, $24,717, $143,019, and $178,462, respectively. Mr. Kelly's principal business is not stated on the Schedules C for 1989 and 1990, but on the Forms 1040 his occupation is described as "stckbrkr-trader". The Schedules C for 1991 and 1992 describe Mr. Kelly's principal business as "trader". A list of all Mr. Kelly's options trades for the year was attached to each of the returns for the years 1989 through 1992. The lists are marked "Attachment to Schedule C", and identify the stock to which the option relates, dates bought and sold, purchase and sale prices, and gain or loss.

During the years at issue Shearson Lehman had a policy of reimbursing employee travel and entertainment expenses, subject to certain documentation and other requirements.  Mr. Kelly received reimbursements from his employer, and claimed deductions for unreimbursed entertainment expenses, in the amounts set forth below:

| Year | Amount Reimbursed | Amount Deducted for Unreimbursed Expenses |
|------|-------------------|-------------------------------------------|
| 1986 | $4,415.00 | $25,200 |
| 1987 | 3,965.00 | [1]25,299 |
| 1989 | 5,611.81 | [2]2,480 |
| 1990 | 2,397.70 | [2]12,440 |
| 1991 | 6,562.81 | [2]1,400 |
| 1992 | 6,426.42 | [2]2,385 |

[1]As reduced by 2 percent of adjusted gross income.
[2]As reduced by 20 percent.

Petitioners have no documents in their possession supporting the claimed unreimbursed entertainment expenses for taxable years 1986, 1987, 1990, 1991, and 1992.  Mr. Kelly used to have an expense diary for 1986, which he produced to respondent's agent in the course of the audit.  The agent informed Mr. Kelly that the diary was of no value in substantiating the claimed deductions.  Mr. Kelly subsequently lost the diary in the course of an office move.  Petitioners did introduce in evidence an expense diary for 1989 together with receipts.  The diary lists total expenses of $5,702.41.  There are receipts to confirm $5,085.76 of the claimed expenses, and for some claimed expenses

information on the receipts does not correspond to the information in the diary.

Petitioners were married in 1941. At the time of trial, they were still living together, and there is no evidence that they were at any time separated.

Mrs. Kelly did not complete high school and took no formal courses in business or finance. Before her marriage to Mr. Kelly and the birth of petitioners' son Edward in 1945, she worked as a telephone operator, dancer, typist, and airline stewardess. After 1945, she was a full-time homemaker, responsible for the upkeep of the family home and for paying bills for household expenses. Edward was born with Down's Syndrome. As his health deteriorated during the 15 years before his death in October 1989, he lived at home under Mrs. Kelly's constant care or in the hospital, where she attended him. During this period Mrs. Kelly was thoroughly preoccupied with Edward's condition and needs for care and seems to have had no interest in discussing financial or business matters with Mr. Kelly.

Mrs. Kelly was aware that her husband was employed by Shearson Lehman as a stockbroker. But they did not discuss his business. Although Mr. Kelly spent a considerable amount of time at home doing work related to his options trading and made no efforts to conceal his activities from her, she remained entirely ignorant of these activities and of the losses he incurred. When

Mr. Kelly entertained business associates at restaurants, Mrs. Kelly sometimes accompanied him. On these occasions she and other women present would carry on their own conversations. At Mr. Kelly's request, Mrs. Kelly sometimes assisted him in maintaining records of the entertainment expenses for purposes of reimbursement.

Mrs. Kelly took no part in the preparation of the joint tax returns for the years at issue. Each of the returns was prepared and signed by the accountant, and then delivered to petitioners for their review. Mrs. Kelly signed the returns without review or inquiry. Mrs. Kelly made no attempt to inform herself of their contents because she trusted Mr. Kelly completely, not because he in any way hindered or discouraged her from doing so. She endorsed the refund checks they received, but neither asked nor cared what Mr. Kelly would do with the money.

In 1989 Mrs. Kelly learned that Mr. Kelly was in a controversy with the Internal Revenue Service. She signed a power of attorney to authorize lawyers to represent them in administrative proceedings. Mr. Kelly did not show her any correspondence with the lawyers regarding the nature of the controversy, and she remained ignorant of the details until after the years at issue.

Petitioners experienced no marked changes in their lifestyle during or after the years at issue. Mrs. Kelly received no

direct benefit from the income tax refunds they received.
Mr. Kelly deposited the refund checks in his separate bank account and used the proceeds to finance further options trading.

OPINION

Petitioners bear the burden of proof on all issues. Rule 142(a).

## 1. Character of Trading Losses

Respondent determined that the stock options sold by Mr. Kelly during the years at issue were capital assets, and that the net losses he realized were accordingly capital losses subject to the limitations of sections 165(f) and 1211(b). We sustain respondent's determination.

Under section 1234, unless an option to buy or sell stock constitutes property described in section 1221(1), gain or loss from the sale of the option is treated as gain or loss from the sale of property having the same character as the stock would have in the taxpayer's hands. Sec. 1234(a)(1), (3)(A). Section 1221(1) creates an exception to the definition of a capital asset for

> Stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

Mr. Kelly contends that his options trading activity was sufficiently regular, substantial, and time-consuming to constitute a trade or business for Federal income tax purposes, so that the losses arising from the activity qualify for ordinary treatment.  This argument confuses a necessary with a sufficient condition.  Buying and selling securities on an exchange must constitute a trade or business in order for the securities to qualify for the exception to capital asset treatment.  But a taxpayer who meets this trade or business requirement may be either a trader or a dealer.  Unless he is a dealer, the securities he holds in connection with his business are capital assets.  Laureys v. Commissioner, 92 T.C. 101, 136-137 (1989); King v. Commissioner, 89 T.C. 445, 457-458 (1987); Polacheck v. Commissioner, 22 T.C. 858, 862 (1954); Kemon v. Commissioner, 16 T.C. 1026, 1032-1033 (1951).  The distinction between trader and dealer turns on whether the taxpayer's business activities have the characteristics specified in section 1221(1).  The parties have stipulated that Mr. Kelly's options trading lacked these characteristics:  Mr. Kelly did not hold his options as inventory; he did not sell to customers; he performed no merchandising function.  Therefore, if he was engaged in the business of buying and selling options, it was as a trader rather than a dealer, and the options would not constitute property described in section 1221(1).  Kemon v. Commissioner, supra;

Tybus v. Commissioner, T.C. Memo. 1989-309; Kobernat v. Commissioner, T.C. Memo. 1972-132.

Mr. Kelly attempts to distinguish the many cases denying ordinary loss treatment under similar circumstances on the ground that he was a registered options principal. He argues that his stock options fall within the literal terms of section 1221(1): "stock options are a Registered Options Principal's 'stock in trade'. Stock options are what a Registered Options Principal is primarily involved in." Mr. Kelly's figurative use of the statutory language finds no support in the case law interpreting it. Property does not constitute "stock in trade" within the meaning of section 1221(1) unless it is held by the taxpayer primarily for sale to customers. Van Suetendael v. Commissioner, 152 F.2d 654, 654 (2d Cir. 1945), affg. a Memorandum Opinion of this Court; Wood v. Commissioner, 16 T.C. 213, 225-226 (1951). The functional significance of the registered options principal to the operation of the securities market and his relationship to a licensed dealer is not entirely clear from the record. For purposes of characterizing Mr. Kelly's trading losses, however, the only question is whether he was acting in the capacity of a dealer when he engaged in the specific transactions that produced the losses. Laureys v. Commissioner, supra; Kemon v. Commissioner, supra. Mr. Kelly concedes that he did not engage in these transactions in his capacity as a registered options

principal. It follows that his status as a registered options principal, whatever that entails, has no bearing on our disposition of these cases.

Because Mr. Kelly was not an options dealer with respect to the transactions in which his losses arose, the character of the stock options depends on the character that the underlying stock would have had in his hands. Sec. 1234(a). Mr. Kelly does not argue that he was a dealer in stock, and the record affords no basis for that conclusion. Therefore the options that Mr. Kelly traded were capital assets, and the net losses he realized in these transactions were capital losses.

## 2. Treatment of Commissions Earned and Paid

On their tax returns for the years at issue, petitioners apparently treated commissions paid to Mr. Kelly by his employer on account of his options trades as ordinary income, and treated commissions paid by Mr. Kelly to his employer in connection with these trades either as part of the cost basis of the options or as an adjustment to the gain or loss realized. In these proceedings petitioners take the position that if they are not entitled to deduct Mr. Kelly's options trading losses in full as ordinary losses, then an "absurd" inconsistency arises between the treatment of the commissions Mr. Kelly earned and paid on the same transactions. Either the earned commissions should be treated as a rebate that reduced his costs to acquire and sell

the options rather than as ordinary income, or the paid commissions should be treated as deductible business expenses that more than offset his commission income. Petitioners argue that this integrated approach to taxing the commission transactions would more accurately reflect their substance and has parallels in other areas of the Code.

We have no occasion to consider whether either of petitioners' proposals for integrating the tax treatment of the commissions at issue to achieve consistency would be desirable as a matter of tax policy; the proper tax treatment of such commissions is well established. The parties have stipulated that Mr. Kelly received the commissions as compensation for providing business for his employer. There is no evidence that they were intended specifically as a discount or rebate. The definition of gross income expressly covers "compensation for services, including * * * commissions". Sec. 61(a)(1). The fact that the taxpayer earned the commissions on transactions in which he acquired property from or through his employer for his own account does not alter their character as ordinary income. The argument that in such cases the commissions should be treated as discounts from the cost of the property, and accounted for by adjustments to basis or the sale price rather than included in gross income, has been repeatedly rejected by this Court and others. Ostheimer v. United States, 264 F.2d 789 (3d Cir. 1959)

(life insurance agent commissions); <u>Williams v. Commissioner</u>, 64 T.C. 1085 (1975) (real estate agent commissions); <u>Bailey v. Commissioner</u>, 41 T.C. 663 (1964) (life insurance agent commissions); <u>Kobernat v. Commissioner</u>, T.C. Memo. 1972-132 (stockbroker commissions).

Costs incurred in the acquisition and disposition of a capital asset are nondeductible capital expenditures. <u>Woodward v. Commissioner</u>, 397 U.S. 572, 575 (1970). Thus, for a taxpayer who is not a dealer, brokerage fees incurred to purchase securities must be added to the cost basis of the securities, and brokerage fees incurred to sell securities must be offset against the sale price. Sec. 1.263(a)-2(e), Income Tax Regs.

3. <u>Employee Business Expenses</u>

Respondent disallowed petitioners' deductions for unreimbursed entertainment expenses on the grounds, inter alia, that the deductions were not substantiated in accordance with section 274(d). Mr. Kelly argues that he adequately substantiated his expenses for at least 1 of the years at issue and that the Court should use its discretion in estimating the amount of the deductible expenses for the other years. We agree with respondent that petitioners are not entitled to any of the claimed deductions.

Section 274(d) was intended to preclude discretionary estimation of certain business expenses by the courts pursuant to

the common law rule of <u>Cohan v. Commissioner</u>, 39 F.2d 540 (2d Cir. 1930). <u>Sanford v. Commissioner</u>, 50 T.C. 823, 828 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5(a), Income Tax Regs. The section provides that no amount may be deducted for entertainment expenses unless the taxpayer substantiates, by adequate records or by sufficient evidence corroborating his own statement: (1) The amount of the expense; (2) the time and place of the entertainment; (3) the business purpose of the entertainment; and (4) the business relationship to the taxpayer of the persons entertained. Substantiated expenses may be deducted only to the extent that they exceed amounts for which the taxpayer was reimbursed. <u>Register v. Commissioner</u>, T.C. Memo. 1988-390.

Mr. Kelly presented no testimony or documentation in support of the claimed deductions for 1986, 1987, 1990, 1991, and 1992. He submitted an expense diary, together with receipts, for 1989. The total amount of expenses for which there are receipts is $5,085.76. Mr. Kelly was reimbursed by Shearson Lehman for his 1989 expenses in the amount of $5,611.81. Accordingly, petitioners have not substantiated any amount of unreimbursed business expenses for this year. Sec. 1.274-5(c)(2), Income Tax Regs.

Mr. Kelly may have maintained records of his business entertainment expenses for other years. During the audit of

petitioners' 1986 and 1987 returns, the revenue agent examined an expense diary for 1986.  This diary and possibly other records as well were lost by Mr. Kelly in the course of an office move. The regulations provide an exception to the normal substantiation requirements where the taxpayer can establish that at one time he possessed adequate records and that his inability to produce them is attributable to fire, flood, or other casualty beyond his control.  In such cases the taxpayer may satisfy his burden of proof by reasonably reconstructing his records.  Sec. 1.274-5(c)(5), Income Tax Regs.  It is doubtful that loss of documentation in transit is a casualty beyond the taxpayer's control within the meaning of section 1.274-5(c)(5), Income Tax Regs.  Gizzi v. Commissioner, 65 T.C. 342, 345 (1975); Silver v. Commissioner, T.C. Memo. 1972-102.  In any event, Mr. Kelly has not attempted to reconstruct the lost records.

4(a)  Additions to Tax for 1986 and 1987

Respondent determined that petitioners are liable for additions to tax for negligence under section 6653(a) for taxable years 1986 and 1987.  Section 6653(a) provides for an addition to tax if any part of an underpayment of tax is attributable to negligence.  The amount of the addition is 5 percent of the entire underpayment plus 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.  Sec. 6653(a)(1)(A) and (B).  Negligence is defined

as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The treatment of an item may be attributable to negligence if the taxpayer failed to maintain adequate records to substantiate it properly. Crocker v. Commissioner, 92 T.C. 899, 917 (1989); Schroeder v. Commissioner, 40 T.C. 30, 34 (1963); Robbins v. Commissioner, T.C. Memo. 1981-449. Any part of an underpayment attributable to a position taken by the taxpayer in reasonable, bona fide reliance upon professional tax advice is not attributable to negligence. Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Jackson v. Commissioner, 86 T.C. 492, 539 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). In order to prove reasonable reliance the taxpayer must demonstrate that he supplied his adviser with complete and accurate information. Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Enoch v. Commissioner, 57 T.C. 781, 803 (1972); Gill v. Commissioner, T.C. Memo. 1994-92, affd. without published opinion 76 F.3d 378 (6th Cir. 1996).

Petitioners have not attempted to contest respondent's determination of negligence insofar as it applies to their failure to substantiate the business expense deductions they claimed. However, Mr. Kelly argues that he acted reasonably in characterizing his trading losses as ordinary losses on

petitioners' income tax returns:  "petitioner Edward Kelly justifiably relied upon the expertise of his Certified Public Accountant and, taking the matter far beyond normal prudence and care, counsel for the taxpayer in the Groetzinger case."

The record does not disclose the details of Mr. Kelly's consultation with Baymiller.  We know from Auerbach's testimony, however, what information Auerbach elicited from Mr. Kelly, and how it influenced the accountant's advice.  In concluding that ordinary loss treatment was warranted, Auerbach apparently attached decisive importance to Mr. Kelly's statement that registration as an options principal qualified him to establish his own business as an options dealer.  The petition in docket No. 28233-91 contains a similar allegation:  "Kelly is a licensed options dealer".  Considering the importance of this allegation to Mr. Kelly's theory of the case, one would have expected him to present evidence verifying its accuracy.  He did not.  When Mr. Kelly was asked as a witness to explain what the status of registered options principal entails, he described responsibilities for reviewing customer accounts and monitoring compliance with institutional rules.  On brief Mr. Kelly asserts only that he was "licensed in the securities business", and in his account of how Auerbach formed his opinion based on the information Mr. Kelly supplied, we find a curious qualification:  "Mr. Auerbach decided that, in view of (A) Mr. Kelly's ROP

status, (B) his <u>stated</u> ability to open his own office and deal as any other broker does, * * * <u>Groetzinger</u> did apply to Mr. Kelly's option trading activities as an ROP". (Emphasis added.) However, Mr. Kelly has not shown by his own testimony or otherwise that his status as a registered options principal in fact entitled him to open his own office and deal in options. Thus he has not satisfied his burden of showing that he provided his accountant with complete and accurate information on this material point. We therefore reject Mr. Kelly's claim of reliance on his accountant. The additions to tax under section 6653(a) are accordingly sustained.

Respondent further determined that petitioners are liable for the additions to tax under section 6661. Section 6661 imposes an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6661(a) and (b)(1). The amount of the understatement is reduced by that portion which is attributable to: (1) The tax treatment of any item for which there was substantial authority, or (2) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B).

Mr. Kelly contests respondent's determination on the ground that petitioners adequately disclosed the facts relevant to their deduction of Mr. Kelly's trading losses.  For purposes of section 6661, disclosure is adequate if it is made on a properly completed Form 8275, on a statement attached to the return in a form prescribed by the regulations, or on the return, provided that the taxpayer provides sufficient facts to enable the Internal Revenue Service to identify the potential controversy. Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987); S. Rept. 97-494 at 274 (1982); sec. 1.6661-4(b), Income Tax Regs.  The Schedules C filed with petitioners' tax returns for 1986 and 1987 show the computation of the net loss and identify Mr. Kelly's principal business as "options dealer".  Petitioners did not disclose the relevant facts affecting the tax treatment of the losses.  Although the identification of Mr. Kelly's business as "options dealer" is highly relevant, it was conclusory, and we have found it to be inaccurate.  The scant information on the 1986 and 1987 returns is consistent with the position that the losses are ordinary, and would not have apprised the Internal Revenue Service of a potential controversy over characterization. The additions to tax under section 6661 are sustained.[5]

_____

[5]Mr. Kelly also contests respondent's method of computing petitioners' liability for the addition to tax under sec. 6661. He contends that in computing the amount of the "underpayment" for purposes of sec. 6661, respondent improperly failed to give
(continued...)

4(b)  Accuracy-Related Penalties for 1989-92

Respondent determined that petitioners are liable for the accuracy-related penalties under section 6662(a) and (b)(1) for the taxable years 1989 through 1992.[6]  These sections impose a penalty equal to 20 percent of the portion of an underpayment of tax that is attributable to negligence or disregard of rules or regulations.  "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code.  Sec. 6662(c).  As under prior law, failure to maintain records to substantiate an item constitutes negligence.  Sec. 1.6662-3(b)(1), Income Tax Regs.  The penalty does not apply to any portion of an underpayment for which the taxpayer had reasonable cause and acted in good faith.  Sec. 6664(c)(1).  For the taxable years at issue, the penalty also may be avoided by making adequate disclosure of relevant information.  Secs. 1.6662-1, -3(a), (c), Income Tax Regs.

---

[5](...continued)
petitioners credit for the amount of tax withheld.  Mr. Kelly is plainly mistaken.  For both 1986 and 1987 respondent properly computed the underpayment as the excess of the corrected tax liability over the net payment (amount withheld less amount refunded).  See Woods v. Commissioner, 91 T.C. 88, 95-99 (1988). Mr. Kelly's challenge to the computation of the "underpayment" for purposes of the accuracy-related penalties for 1989-92 on the same ground is similarly without merit.  See sec. 6664(a).

[6]By amendment to answer, respondent also asserted accuracy-related penalties under sec. 6662(b)(2).  We need not consider the alternative theory.

Mr. Kelly contests petitioners' liability for accuracy-related penalties using largely the same arguments he used to challenge the additions to tax for 1986 and 1987. There is no dispute that the negligence penalty applies to the portion of the underpayment attributable to petitioners' unsubstantiated employee business expense deductions. Valadez v. Commissioner, T.C. Memo. 1994-493; sec. 1.6662-3(b)(1), Income Tax Regs. Reliance on professional tax advice may qualify for the reasonable cause and good faith exception. Sec. 1.6664-4(b)(1), Income Tax Regs. Yet inasmuch as Mr. Kelly failed to prove the accuracy of the information on which petitioners' return preparer based his judgment, he cannot avoid application of the negligence penalty to the ordinary loss deductions. Eyefull Inc. v. Commissioner, T.C. Memo. 1996-238; Saghafi v. Commissioner, T.C. Memo. 1994-238.

Mr. Kelly's contention that petitioners adequately disclosed the relevant facts relating to their treatment of the trading losses is likewise without merit. Petitioners' returns for 1989 through 1992 describe Mr. Kelly's business as "trader", and an attachment to each return lists Mr. Kelly's trades during the year. This information does not constitute adequate disclosure. The adequate disclosure exception to the negligence penalty is provided for in sections 1.6662-3(c) and -4(f), Income Tax Regs., which became effective for returns due after December 31, 1991.

Sec. 1.6662-2(d)(1), Income Tax Regs. Under these regulations, disclosure is adequate if and only if it is made on Form 8275 (or Form 8275-R). Secs. 1.6662-3(c)(2) and -4(f)(1), Income Tax Regs. Petitioners did not file Form 8275 for 1991 or 1992.[7] For returns due prior to the effective date of sections 1.6662-3(c), and -4(f), Income Tax Regs., taxpayers were entitled to rely on Notice 90-20, 1990-1 C.B. 328, as authority for the adequate disclosure exception. Closely tracking the language of the legislative history that directed the Secretary to provide for such an exception, Notice 90-20 states that "disclosure must be full and substantive and be clearly identified as being made to avoid imposition of the accuracy-related penalty." Id. at 329; H. Rept. 101-247 at 1393 (1989). Disclosure may be made on Form 8275. Alternatively, it may be made on the return, in which case the front page of the return must bear the caption "DISCLOSURE MADE UNDER SECTION 6662." Id. Petitioners' returns for 1989 and 1990 did not comply with these requirements and no Forms 8275

---

[7]For the first time in his reply brief, Mr. Kelly challenges the validity of these regulations on the ground that they exceed the scope of the Secretary's interpretive authority. Mr. Kelly evidently believes that the conditions in the regulations for adequate disclosure are too restrictive. The argument was raised too late for consideration. Aero Rental v. Commissioner, 64 T.C. 331, 338 (1975). We note in passing, however, that as the statute itself provides no exception to the negligence penalty for adequate disclosure, we fail to see how invalidating the regulations would serve petitioners' interest.

were filed.  The accuracy-related penalties are sustained for all years.

5.  <u>Innocent Spouse</u>

Mrs. Kelly sought to escape liability on the ground that she was an innocent spouse within the meaning of section 6013(e). Under section 6013(e)(1), an individual who filed a joint return with her spouse may obtain relief from joint liability for tax where all of the following requirements are satisfied:  (1) A joint return was filed on which; (2) there was a substantial understatement of tax attributable to grossly erroneous items of her spouse; (3) in signing the return she neither knew nor had reason to know of such understatement; and (4) taking into account all the facts and circumstances, it would be inequitable to hold her liable for the resulting deficiencies.  It is undisputed that joint returns were filed for each of the taxable years at issue, that there was a substantial understatement for each year, and that the understatements were attributable to Mr. Kelly.

"Grossly erroneous items" include any claim of a deduction "in an amount for which there is no basis in fact or law."  Sec. 6013(e)(2)(B).  The courts have held that a claim "without a basis in fact or law" is one that is frivolous, fraudulent, or phony.  <u>Friedman v. Commissioner</u>, 53 F.3d 523, 529 (2d Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-549; <u>Bokum</u>

v. Commissioner, 94 T.C. 126, 142 (1990), affd. 992 F.2d 1132 (11th Cir. 1993); Douglas v. Commissioner, 86 T.C. 758, 763 (1986); Purcell v. Commissioner, 86 T.C. 228, 240 (1986), affd. 826 F.2d 470 (6th Cir. 1987).

Mrs. Kelly took the position that both the employee business expense deductions and the ordinary loss deductions were not only plainly without merit, but "phony".  She argued that in view of Shearson Lehman's reimbursement policy, "If * * * the claimed unreimbursed expenses had a factual basis, there is no logical explanation why they were not reimbursed.  * * *  The logical inference from the failure to seek reimbursement or, if it was sought, to obtain it, is that the claimed expenses were never incurred or were not business-related."  An alternative explanation, however, is that the expenses were not reimbursed by Mr. Kelly's employer, or that Mr. Kelly did not seek reimbursement, for the same reason that the deductions were disallowed by respondent, a failure to substantiate.[8]  Failure to substantiate adequately does not, by itself, prove that the expenses were fictitious or were nondeductible personal expenses.

---

[8]It is not uncommon for employees to refrain from pursuing claims for reimbursement to which they would be entitled under the employer's policy, believing it impolitic to do so in view of the nature or amount of the relevant expenses.  There is nothing in the record that would rule this out as another possible explanation for why Mr. Kelly might not have obtained reimbursement in spite of having genuinely incurred business-related expenses.

Douglas v. Commissioner, 86 T.C. at 763; cf. Perry v. Commissioner, T.C. Memo. 1992-258.

Mrs. Kelly conceded that the options trading losses reported on the joint returns were real. She contended, however, that the deductions were "phony" because they were based on "outright deception, followed by obfuscation": That in support of the deductions for 1986 and 1987, on Schedule C Mr. Kelly fraudulently represented that he was an options dealer, and that in support of the deductions for 1989 and 1990, he deliberately omitted to report the nature of his business on Schedule C in order not to jeopardize the deductions.

There are a number of serious weaknesses in this argument. First, the argument applies only to the first 4 of the years at issue. There is no suggestion of deliberate misrepresentation in the reporting of Mr. Kelly's losses for 1991 and 1992.

Second, the argument fails to take account of the fact that on the joint returns for the 3 years preceding the first year in which Mr. Kelly adopted ordinary treatment for his options trading losses, he consistently reported his business as "dealer". Yet he did not use this status to claim any tax benefits for these years. The inference that for 1986 and 1987 he misrepresented the nature of his business with fraudulent intent is therefore not compelling.

Third, on brief Mrs. Kelly evidently accepted the accuracy of Mr. Kelly's representation to Auerbach that registration as an options principal qualified Mr. Kelly to do business as an option dealer. Inasmuch as Auerbach, an experienced tax professional, also accepted this conclusion, it appears to us that Mr. Kelly's representation of himself as an options dealer on the returns did not constitute such a substantial deviation from ordinary behavior that it cannot be ascribed to an honest misunderstanding or simple carelessness.

In this connection, Reid v. Commissioner, T.C. Memo. 1989-294, cited by respondent, appears to us to have a bearing on the outcome. In that case, the husband's losses on commodity futures transactions were incorrectly treated as ordinary rather than capital on the joint returns. It was held that there was a basis in fact for the losses because they had actually been sustained and that there may also have been some basis in law for the argument that the losses were ordinary because the futures transactions were related to the husband's farm operations (an argument under Corn Prods. Ref. Co. v. Commissioner, 350 U.S. 46 (1955)). Similarly here, the fact that Mr. Kelly was in the securities business and that he and the return preparers had concluded, in the aftermath of Commissioner v. Groetzinger, 480 U.S. 23 (1987), that he was entitled to be treated as a dealer in

options provided an arguably colorable--albeit incorrect--basis for the position taken on the joint returns.

There is no evidence that the deductions were frivolous, fraudulent, phony, or otherwise so groundless as to be grossly erroneous. Accordingly, the substantial understatements for the taxable years at issue were not attributable to grossly erroneous items. We need not consider the other requirements for innocent spouse relief.[9]

In view of the foregoing,

> Decision will be entered under Rule 155 in docket No. 28233-91, and decision will be entered for respondent in docket No. 7795-94.

---

[9]After the reply briefs in these cases had been filed, the Court of Appeals for the Seventh Circuit decided Resser v. Commissioner, 74 F.3d 1528 (7th Cir. 1996), revg. and remanding T.C. Memo. 1994-241. By letter, counsel for Mrs. Kelly called the decision to our attention in the belief that the facts were in some respects similar to those of these cases. Since neither this Court nor the Court of Appeals for the Seventh Circuit decided whether the understatement in that case resulted from grossly erroneous items, and the case has been remanded to this Court for further findings on that issue, we leave for another day any discussion of the opinion of the Court of Appeals for the Seventh Circuit in Resser.